**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOSEPHINE H. SPAULDING; DALE E.
HAYLETT, JR.,

   *Plaintiffs-Appellants,*

   v.

WELLS FARGO BANK, N.A., d/b/a
America's Servicing Company,
successor by merger to Wells
Fargo Home Mortgage, Inc.,

   *Defendant-Appellee.*

No. 12-1973

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
George L. Russell, III, District Judge.
(1:11-cv-02733-GLR)

Argued: March 20, 2013

Decided: April 19, 2013

Before DAVIS and THACKER, Circuit Judges, and
Mark S. DAVIS, United States District Judge for the
Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion. Circuit Judge Davis wrote the
opinion, in which Judge Thacker and District Judge Davis
joined.

---

**COUNSEL**

Jason Ostendorf, LAW OFFICE OF JASON OSTENDORF, LLC, Owings Mills, Maryland, for Appellants. Virginia Wood Barnhart, TREANOR, POPE & HUGHES, Towson, Maryland, for Appellee.

---

**OPINION**

DAVIS, Circuit Judge:

Faced with financial hardship and a monthly mortgage payment they could not afford, Appellants Josephine Spaulding and Dale Haylett applied for a mortgage modification under the Home Affordable Modification Program ("HAMP"). Their mortgage servicer, Appellee Wells Fargo Bank, N.A., denied their application. Feeling aggrieved by Wells Fargo's actions, Spaulding and Haylett filed suit, alleging five state law claims. The district court concluded that Appellants had failed to state a claim upon which relief could be granted and therefore granted Wells Fargo's motion to dismiss. For the reasons that follow, we affirm.

I.

A.

HAMP was part of Congress's response to the financial and housing crisis that struck the country in the fall of 2008. It provided an incentive for lenders to modify mortgages so that struggling homeowners could stay in their homes. *See* "Emergency Economic Stabilization Act of 2008," Pub L. No. 110-343, 122 Stat. 3765 (2008), codified at 12 U.S.C. § 5201 *et seq.*[1]

---

[1]The Emergency Economic Stabilization Act states:

The purposes of this chapter are—

The Seventh Circuit recently explained the Emergency Economic Stabilization Act and HAMP's role in it:

> The centerpiece of the Act was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury, among many other duties and powers, to "implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures." 12 U.S.C. § 5219(a). Congress also granted the Secretary the authority to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." *Id.*
>
> Pursuant to this authority, in February 2009 the Secretary set aside up to $50 billion of TARP funds to induce lenders to refinance mortgages with more favorable interest rates and thereby allow homeowners to avoid foreclosure. The Secretary negotiated Servicer Participation Agreements (SPAs) with dozens of home loan servicers, including Wells Fargo. Under the terms of the SPAs, servicers agreed to identify homeowners who were in default or would likely soon be in default on their mortgage pay-

---

(1) to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States; and

(2) to ensure that such authority and such facilities are used in a manner that—

(A) protects home values, college funds, retirement accounts, and life savings; [and]

(B) preserves homeownership and promotes jobs and economic growth; . . . .

12 U.S.C. § 5201.

ments, and to modify the loans of those eligible under the program. In exchange, servicers would receive a $1,000 payment for each permanent modification, along with other incentives. The SPAs stated that servicers "shall perform the loan modification . . . described in . . . the Program guidelines and procedures issued by the Treasury . . . and . . . any supplemental documentation, instructions, bulletins, letters, directives, or other communications ... issued by the Treasury." In such supplemental guidelines, Treasury directed servicers to determine each borrower's eligibility for a modification . . . :

[T]he borrower had to meet certain threshold requirements, including that the loan originated on or before January 1, 2009; it was secured by the borrower's primary residence; the mortgage payments were more than 31 percent of the borrower's monthly income; and, for a one-unit home, the current unpaid principal balance was no greater than $729,750. . . .

Where a borrower qualified for a HAMP loan modification, the modification process itself consisted of two stages. After determining a borrower was eligible, the servicer implemented a Trial Period Plan (TPP) under the new loan repayment terms it formulated using the waterfall method. The trial period under the TPP lasted three or more months, during which time the lender "must service the mortgage loan . . . in the same manner as it would service a loan in forbearance." Supplemental Directive 09–01. After the trial period, if the borrower complied with all terms of the TPP Agreement — including making all required payments and providing all required documentation — and if the borrower's representations remained true and correct, the servicer had to offer a permanent modification. *See* Supplemental

Directive 09–01 ("If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period. . . .").

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556-57 (7th Cir. 2012) (footnote omitted). As generally described in *Wigod*, Wells Fargo entered into a Servicer Participation Agreement ("SPA") with the Secretary of the Treasury ("the Secretary"). The SPA expressly incorporated the HAMP guidelines, procedures, and supplemental directives issued by the Secretary.

The law gave the Secretary authority to issue directives and other guidelines for each mortgage servicer participating in HAMP. *See* 12 U.S.C. § 5219a. The Federal Home Loan Mortgage Corporation ("Freddie Mac") is the sole compliance agent responsible for enforcing HAMP. *See* John R. Chiles & Matthew T. Mitchell, *HAMP: An Overview of the Program and Recent Litigation Trends*, 65 Consumer Fin. L.Q. Rep. 194, 197 (Spring/Summer 2011). Freddie Mac conducts on-site reviews of participating servicers' HAMP-related operations and performs off-site analyses of the HAMP-related documents the servicers provide on a regular basis. *Id.*

Perhaps not surprisingly, given the large stakes for financially stressed homeowners, and in light of widespread media reports of bureaucratic bungling (and worse) on the part of lenders, mortgage servicers, and their myriad agents, HAMP has given rise to a large number of civil claims by mortgagors against financial industry firms. The claims here arise with that general background.

### B.

Spaulding and Haylett purchased their home in Glenelg, Maryland, in March 1997. In January 2006, they refinanced their mortgage with Fremont Investment & Loan of Fullerton,

California, which later assigned servicing rights to Wells Fargo. At that time, Appellants owed a principal balance of $361,610, and they refinanced to take out a new mortgage of $418,000. The new mortgage was an adjustable rate 30-year mortgage with an initial rate of 6.95%. At that rate, Appellants' initial monthly payment was $2,582. The interest rate remained at 6.95% for two years, when it was then eligible to change every six months, keyed to the London Interbank Offered Rate ("LIBOR"). The mortgage rate, however, would never exceed 12.95% or fall below 6.95%.

In early 2010, Appellants suffered financial hardship and became unable to make their full monthly mortgage payments. On February 24, 2010, they wrote a "hardship letter" to Wells Fargo, explaining the reasons for their difficulties in making their payments. J.A. 80. The letter stated that Spaulding suffered from collagenous colitis, which caused her stomach pains and diarrhea and, combined with other physical ailments, prevented her from working full-time. The letter also stated that Haylett had lost work hours because of the recession and the "bad Maryland weather," an apparent reference to the major snowstorms that struck the state in February 2010. J.A. 80. Haylett's occupation is not stated, but his pay stubs are from Integrated Electrical Services of Houston, Texas. The Appellants included two of Haylett's weekly pay stubs with their mortgage modification application — one, dated February 12, 2010, showing gross pay of $1,714.40, and one dated February 19, 2010, showing gross pay of $342.88. They also reported earning $450 a month in rental income and a monthly disability payment for Spaulding of $165.

Wells Fargo responded a week later, in a letter dated March 1, 2010, stating that it had received Appellants' "inquiry regarding your mortgage loan" and that in order to process the request for a loan modification the bank needed additional proof of income. J.A. 92. Specifically, the bank asked for two additional weekly pay stubs for Haylett reflecting pay-dates either after February 19, before February 12, or one of each.

The letter further stated that if the information or a request for an extension was not received within ten days, the modification request would be considered cancelled. The Appellants submitted the additional proof of income by fax on March 22, eleven days past the deadline set in the March 1 letter.

It appears that nowhere in the record have Appellants offered any explanation or otherwise attempted to account for their delay in responding to Wells Fargo's March 1 letter containing the ten-day deadline. To the contrary, as we discuss *infra*, Appellants have insisted, alternatively, that Wells Fargo did not need to see additional pay stubs and/or that its receipt of the additional pay stubs after the deadline was sufficient to qualify them for HAMP relief.[2]

In any event, Wells Fargo sent a delinquency notice on April 5, 2010, asserting the Appellants owed $4,779. Wells Fargo sent a second HAMP introduction letter and application packet on July 2. Additional delinquency notices were sent on July 6 and July 18. A "Notice of Intent to Foreclose" was sent on July 18. On August 11, 2010, Wells Fargo sent Appellants a denial of their HAMP application, citing their failure to provide the requested documents within the specific time period. Appellants continued to apply for a HAMP modification after that, but were denied each time.

Another foreclosure notice was sent on September 5, 2010.

---

[2]Appellants' mantra is succinctly captured on page 9 of their Brief:

> The application contained all of the documentation "required" under the HAMP Guidelines . . . . The application showed that the homeowners were eligible under HAMP . . . . Under the HAMP Guidelines, which Wells Fargo knowingly adopted . . . , Wells Fargo was required to issue a HAMP modification to the homeowners.

As we explain *infra* p. 13, these counterfactual legal conclusions do not enable appellants to overcome the legal insufficiency of their state law claims.

By that point, Appellants had not made a mortgage payment since June 14.[3]

### C.

On July 25, 2011, Spaulding and Haylett filed suit against Wells Fargo in the Circuit Court for Howard County, Maryland, alleging five counts: breach of implied-in-fact contract (Count I), negligence (Count II), violations of the Maryland Consumer Protection Act ("MCPA") (Count III), negligent misrepresentation (Count IV), and common law fraud (Count V). Wells Fargo removed the action to the United States District Court for the District of Maryland on the basis of diversity.

The district court dismissed the complaint in its entirety. *Spaulding v. Wells Fargo Bank, N.A.*, Civ. No. GLR–11–2733, 2012 WL 3025116, at *3 (D. Md. July 23, 2012). The court found that absent a Trial Period Plan ("TPP") agreement, which creates privity of contract, "a suit that seeks the general enforcement of the HAMP guidelines must fail." *Id.* The court noted that Congress created no private right of action for the denial of a HAMP application, citing several in-district cases to that effect. *See id.* (citing *Ramos v. Bank of America, N.A.*, No. DKC-11-3022, 2012 WL 1999867, at *3 (D. Md. June 4, 2012); *Allen v. CitiMortgage, Inc.*, No. CCB-10-2740, 2011 WL 3425665, at *4 (D. Md. Aug. 4, 2011)). Here, the district court noted, the plaintiffs did not allege that a TPP agreement was in place or even that it was offered. *Id.* Therefore, because "the entire Complaint arises out of an alleged failure to follow the HAMP guidelines," it must fail. *Id.*

The court found that Count I, breach of implied-in-fact con-

---

[3]We were advised at oral argument that Wells Fargo has voluntarily suspended all efforts to foreclose the mortgage pending the outcome of this appeal.

tract, failed because no contract, either express or implied, existed between the plaintiffs and Wells Fargo. *Spaulding*, 2012 WL 3025116, at *4. The Appellants had applied for a TPP agreement, but Wells Fargo rejected their application. *Id.* Thus, there was never any contract to be breached.

The court found that Count II (negligence) and Count IV (negligent misrepresentation) failed "because Wells Fargo did not owe Plaintiffs a tort duty." *Spaulding*, 2012 WL 3025116, at *4. The court noted that in Maryland, "causes of action based on negligence or negligent misrepresentation require the plaintiff to prove a duty owed to them." *Id.* (citing *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 758 (Md. 1986)). Because in Maryland the relationship between a bank and borrower "is contractual, not fiduciary, in nature," then, absent special circumstances, courts are reluctant to impose extra, fiduciary duties upon a bank not found in the contract or loan agreement a bank has with its customer. *Id.* at *5. The court thus found that because the Appellants and Wells Fargo had not entered into an implied or express contract, no tort duty could arise as a matter of law. *Id.* at *6.

Finally, the court considered Count III (violations of the MCPA) and Count V (common law fraud) of the complaint. The court noted that the MCPA prohibits the making of a "false . . . or misleading oral or written statement" that has the capacity, tendency, or effect of deceiving or misleading consumers. *Spaulding*, 2012 WL 3025116, at *6 (citing Md. Code Ann., Com. Law § 13-301(1)). To bring a common law fraud claim, a party must show "'that the defendant made a false representation.'" *Id.* (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 527 (Md. Ct. Spec. App. 1992)). Here, the court observed, Wells Fargo acknowledged receipt of the Appellants' loan modification application and replied by asking for additional information within a specified period, a deadline Appellants failed to meet. The court found that the clarity of Wells Fargo's letter "does not support Plaintiffs' allegations of the misrepresentations needed to support claims

of MCPA violations and common law fraud." *Id.* Further, the Appellants had not met the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Accordingly, the court granted Wells Fargo's motion to dismiss. *Id.* at *8.

Appellants filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review a district court's grant of a motion to dismiss *de novo*, focusing only on the legal sufficiency of the complaint. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). We "take the facts in the light most favorable to the plaintiff," but "we need not accept the legal conclusions drawn from the facts." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.

Appellants alleged five state law counts: (1) breach of implied-in-fact contract; (2) negligence; (3) violations of the Maryland Consumer Protection Act; (4) negligent misrepresentation; and (5) common law fraud. We hold for the reasons set forth within that the district court correctly granted Wells Fargo's motion to dismiss all five counts.[4]

---

[4]Appellants repeatedly acknowledge that they have no federal claims under HAMP. *See* Appellants' Br. at 6 ("[T]here is no private right of action under HAMP . . . ."); *id.* at 20 ("[T]he HAMP Guidelines are not actionable on their own as there is no private right of action under HAMP."). They also contend, correctly, that the mere fact that HAMP does not provide a private right of action does not mean that all state law claims affiliated with or related to an unsuccessful HAMP application are necessarily preempted. *See Wigod*, 673 F.3d at 581 ("The absence of a pri-

## A.

Under Maryland law, "[t]he formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004) (citing *Peer v. First Fed. Sav. and Loan Ass'n of Cumberland*, 331 A.2d 299, 301 (Md. 1975)). "An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Hercules, Inc. v. United States*, 516 U.S. 417, 424 (1996) (quoting *Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592, 597 (1923)).

Appellants argue that the parties "clearly shared a tacit understanding [rising to the level of an implied-in-fact contract] that the application was to be processed [and approved] under HAMP." Appellants' Br. at 18. According to Appellants, there was sufficient consideration on their side of this alleged implied-in-fact contract:

> The consideration was the [Appellants'] promise to comply with the HAMP requirements, and [their] act

vate right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law.").

Rather, as we explored at considerable length during oral argument, we understand Appellants' overarching theory of the case to be that in agreeing to participate in HAMP, Wells Fargo voluntarily subjected itself to new, federally-defined, self-activating legal duties and that "the standard of care" imposed by those duties essentially "mapped onto," and thereby supplemented, existing state law principles and causes of action. We find Appellants' theory largely incoherent but, in any event, we conclude that the district court did not err in its evaluation of the legal sufficiency of the complaint they filed in this case.

> of taking time to complete and submit the application.

Appellants' Br. at 6 (insertions added). Moreover, according to Appellants, Wells Fargo bound itself to comply with the applicable "standard of care," *see supra* n.4, by virtue of its following conduct: (1) entering into an agreement with the U.S. Treasury to participate in HAMP; (2) consenting to the U.S. Treasury publicly listing Wells Fargo as a HAMP participant; (3) stating, in its foreclosure notice to Appellants, that "[i]f you are eligible [for HAMP], we will look at your monthly income and housing costs, including any past due payments, and then determine an affordable mortgage payment"; and (4) regularly sending "HAMP Starter Kits" to distressed homeowners stating, "To start, we must receive specific documentation from you. Then we determine if you qualify for the first step of the process, which is the trial period plan." *Id.* at 19.

As a matter of law, however, none of this conduct is sufficient to constitute a "meeting of the minds" evidencing a contract, implied-in-fact or otherwise. Wells Fargo's agreement with the U.S. Treasury was an agreement between the bank and the Treasury, an agreement to which Appellants were not a party and which they have no authority to enforce. Nothing about that agreement could be considered to extend legal rights to Appellants.

Moreover, both the foreclosure notice and HAMP Starter Kit contain clear qualifying language that falls short of the definiteness required to make a contract. Under long-settled contract law, when "some further act of the purported offeror is necessary, the purported offeree has no power to create contractual relations, and there is as yet no operative offer." 1 Joseph M. Perillo, *Corbin on Contracts* § 1.11, at 31 (rev. ed. 1993). *See also* 1 Richard A. Lord, *Williston on Contracts* § 4:27 (4th ed. 2011) ("[A] condition of subsequent approval by the promisor in the promisor's sole discretion gives rise to

no obligation."). The language in the foreclosure notice and Starter Kit (e.g., "we determine if you qualify") makes clear that further action was required on the part of Wells Fargo before an offer would be extended. When there is no offer, there can be no contract.

Appellants fall back on the argument that Wells Fargo offered "to process an application under HAMP." Appellants' Br. at 19. Assuming *arguendo* this was an "offer" amenable to a binding "acceptance" by Appellants (though, as explained, the qualifying language extinguishes such a theory) and that Appellants accepted the offer by submitting an application on February 24, 2010, Wells Fargo did in fact process the application, as shown by its March 1, 2010, letter to Appellants noting receipt of the application and asking for additional income information. Appellants' repeated invocation, *see supra* n.2, of their counterfactual legal conclusions ("The application contained all of the documentation 'required' under the HAMP Guidelines . . . . The application showed that the homeowners were eligible under HAMP . . . . Under the HAMP Guidelines, which Wells Fargo knowingly adopted . . . , Wells Fargo was required to issue a HAMP modification to the homeowners.") is exactly that: a counterfactual mantra constituting at most unadorned legal conclusions, legal conclusions which the district court was correct to reject. *See E. Shore Mkts., Inc.*, 213 F.3d at 180. Thus, Appellants have not plausibly stated a breach of contract claim sufficient to survive a 12(b)(6) motion to dismiss.

### B.

The negligence claim fares no better than the breach of contract claim. The Maryland Court of Appeals has held that "[t]o establish a cause of action in negligence a plaintiff must prove the existence of four elements: a duty owed to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Jacques*, 515 A.2d

at 758. "Absent a duty of care, there can be no liability in negligence." *Id.*

Banks typically do not have a fiduciary duty to their customers. "It is well established that 'the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor and is not fiduciary in nature.'" *Kuechler v. Peoples Bank*, 602 F. Supp. 2d 625, 633 (D. Md. 2009) (quoting *Yousef v. Trustbank Savs., F.S.B.*, 568 A.2d 1134, 1138 (Md. Ct. Spec. App. 1990)). "'Courts have been exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement.'" *Id.* (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 532 (Md. Ct. Spec. App. 1992)). "'[I]n cases . . . where there are none of these special circumstances and no contractual basis for a special duty of care is alleged, a lender owes no duty of care to its borrower.'" *Id.* (quoting *Parker*, 604 A.2d at 534) (insertion and ellipsis in original).

Notwithstanding this case law, Appellants argue that Wells Fargo owed them a duty to process their loan modification application under HAMP, Appellants' Br. at 25, and that Wells Fargo breached this duty when it deviated from the applicable "standard of care" in failing to process their application, *id.* at 28. This contention does not withstand scrutiny under Maryland law. The Maryland Court of Appeals has stated that "[w]here the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability." *Jacques*, 515 A.2d at 759. "This intimate nexus is satisfied by contractual privity or its equivalent." *Id.* at 759-60.

As explained above, contractual privity has not been remotely pled here. Appellants argue, however, that the facts that established contractual privity in *Jacques* also exist here.

They are wrong. In *Jacques*, 515 A.2d at 756, plaintiffs executed a residential sales contract to purchase a home for $142,000. The contract required them to pay $30,000 in cash and secure the $112,000 balance through a conventional loan. *Id.* The Jacques applied for a loan with First National Bank, submitting a copy of their contract with the application. *Id.* at 757. They also sent a $144 processing fee. The bank acknowledged receiving the application and, in a letter, stated that it would hold a rate of 11-7/8% for 90 days. *Id.* Three weeks later, the bank informed the Jacques they were approved for a loan of $74,000 — less than what they needed under the contract. *Id.* Some time after that, the bank told the Jacques it had miscalculated and they were in fact only approved for a loan of $41,400. *Id.* The Jacques tried to get a $100,000 loan from another bank, but by then interest rates had gone up two points. *Id.*

The Jacques filed suit against First National Bank; a jury found for the Jacques on their negligence claim and awarded them $10,000. *Jacques*, 515 A.2d at 758. The Court of Appeals affirmed the judgment, holding that "under the particular facts of this case," the bank was properly charged with a duty of reasonable care in processing the Jacques' loan application. *Id.* at 756. The court noted that the bank made at least two express promises to the Jacques — that it would process their loan application and that it would lock in the 11-7/8% interest rate for 90 days. *Id.* at 761. The court held that the $144 processing fee was sufficient consideration for these promises. *Id.* The court also noted the "rather extraordinary financing provisions contained in the real estate sales contract" and that the bank was "well aware" of the provisions. *Id.* at 762-63. In these circumstances, the court found the bank had a duty to exercise reasonable care in processing the application. But the court added a caveat:

> The case before us is factually distinguishable from those in which a prospective customer simply submits an application for a loan, or for insurance, and

thereafter claims that the unilateral act of submitting the application gives rise to a duty on the part of the recipient to act upon it without delay. The courts have generally held in those instances that the bank or insurance company has not undertaken to process the application, and therefore has no duty to do promptly that which it has no duty to do at all.

*Id.* at 762 (collecting cases).

The special circumstances in *Jacques*, which the court found created a contract and an implied promise to use reasonable care in the performance thereof, 515 A.2d at 762, are not present here. First, the consideration paid by the plaintiffs in *Jacques*, which created a contract, does not exist here. Second, the bank made several promises specific to the Jacques (such as offering a $71,000 loan and locking in an interest rate), the sort of which were not made here. Third, the bank was made aware of the highly particular requirements of the Jacques' real estate contract.

Here, there was no express or implied contract, and therefore, as the district court concluded, no tort duty could arise as a matter of law. *Spaulding*, 2012 WL 3025116, at *6. Wells Fargo never made any promises to Appellants, and Appellants never provided any consideration to Wells Fargo. The claim for negligence must therefore fail, as the bank owed no duty to Appellants.[5]

---

[5]Again, assuming *arguendo* the bank owed a duty to process the HAMP application with reasonable care, it did exactly that. Appellants sent their application on February 24, 2010. Wells Fargo responded a week later, on March 1, asking for the additional pay stub information within ten days. Appellants did not reply within the time specified. If Wells Fargo had a duty, it did not breach it. Plaintiffs therefore have not stated a claim for negligence. *See Jacques*, 515 A.2d at 758. Appellants' mere disagreement with how Wells Fargo conducted the application process does not give them enforceable rights.

## C.

The Maryland Consumer Protection Act prohibits unfair or deceptive trade practices, including in connection with the collection of consumer debts. Md. Code Ann., Com. Law § 13-103. The statute defines unfair or deceptive trade practices as, *inter alia*, a "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." *Id.* § 13-301(1).

Appellants allege that Wells Fargo made a misrepresentation when it stated that it needed more information — specifically, two more pay stubs — to process Appellants' HAMP application. Appellants argue this statement was false because "the homeowners had already sent the 'required' documentation to Wells Fargo on February 24, 2010." Appellants' Br. at 22. However, HAMP requires that a borrower "has documented a financial hardship and represented that he or she does not have sufficient liquid assets to make the monthly mortgage payments." Making Home Affordable Program, *Handbook for Servicers of Non-GSE Mortgages Version 3.0*, at 41 (Dec. 2, 2010).[6] The two pay stubs Appellants sent with their HAMP application accounted for only two weeks of pay. Wells Fargo's request for two more pay stubs would have provided the bank with a full month's worth of income documentation. Wells Fargo therefore made no false representation in its March 1 letter.

The only other document Appellants point to as evidencing a falsehood by Wells Fargo was the bank's August 11, 2010, letter in which the bank stated that "you did not provide us with the documents we requested." J.A. 125. Appellants point

---

[6]Earlier versions of the Handbook contain the same financial hardship requirement. *See, e.g.*, https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_10.pdf, at 17.

out that they did provide the additional requested pay stubs —
on March 22, eleven days late — and so the bank's statement
was false. But this selective parsing of the letter is to no avail;
Wells Fargo's August 11 letter also stated, in the next sen-
tence, "A notice which listed the specific documents we
needed *and the time frame required to provide them* was sent
to you more than 30 days ago." J.A. 125 (emphasis added). A
reasonable reading of the August 11 letter is that Appellants
did not provide the requested documents *within the specified
time frame*. Even without reading the letter in that fashion,
however, there is no claim that the further elements of an
MCPA violation are evident — such as Wells Fargo having
the "purpose" of defrauding with that statement or Appellants
relying upon that statement and suffering damages because of
it.

Finally, the MCPA claim, which sounds in fraud, is subject
to the heightened pleading standards of Federal Rule of Civil
Procedure 9(b), which requires a plaintiff to plead "with par-
ticularity the circumstances constituting fraud." Fed. R. Civ.
P. 9(b). The circumstances include "'the time, place, and con-
tents of the false representations, as well as the identity of the
person making the misrepresentation and what he obtained
thereby.'" *Harrison v. Westinghouse Savannah River Co.*, 176
F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright
& Arthur R. Miller, *Federal Practice and Procedure: Civil*
§ 1297, at 590 (2d ed. 1990)).

In *Allen v. CitiMortgage, Inc.*, 2011 WL 3425665, at *9,
for instance, the district court found the plaintiffs had satisfied
the Rule 9(b) heightened pleading standards because they had
pled "the dates and contents of numerous contradictory letters
sent by CitiMortgage that they allege were both misleading
and false." There, plaintiffs had been accepted into a TPP and
they received contradictory information about when the TPP
started and whether or not they remained in the program. *Id.*
As a result, the plaintiffs' credit score was damaged and they

forwent alternative legal remedies to save their home. *Id.* at *10.

The *Allen* circumstances are not present here. Appellants have not identified any contradictory correspondence sent by Wells Fargo. The alleged false statements described above were demonstrably *not* false. Additionally, Appellants allege "that Wells Fargo has made and continues to make a false statement to them and all of Wells Fargo's customers, whenever Wells Fargo represents that it intends to comply with its HAMP obligations." Appellants' Br. at 24. This vague generalization is not sufficiently particular to comply with Rule 9(b)'s heightened pleading requirements.

### D.

To state a claim for negligent misrepresentation the plaintiff must allege facts plausibly showing that:

> (1) the defendant, owing a duty of care to the plaintiff, negligently assert[ed] a false statement;

> (2) the defendant intend[ed] that his statement [would] be acted upon by the plaintiff;

> (3) the defendant ha[d] knowledge that the plaintiff [would] probably rely on the statement, which, if erroneous, [would] cause loss or injury;

> (4) the plaintiff, justifiably, [took] action in reliance on the statement; and

> (5) the plaintiff suffer[ed] damage proximately caused by the defendant's negligence.

*Goldstein v. Miles*, 859 A.2d 313, 332 (Md. Ct. Spec. App. 2004) (citing *Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534, 539 (Md. 1982) (insertions in original)).

The two statements that Appellants allege were false and induced reliance — the bank's March 1 letter stating it needed more information to process the HAMP application and its August 11 letter stating that Appellants "did not provide us with the documents we requested," J.A. 125 — were not in fact false, as explained above. Further, Wells Fargo did not owe a duty of care to the Appellants, a required element of negligent misrepresentation. Finally, there is no plausible claim that Appellants *justifiably* took action in reliance on the alleged false statements or suffered damages *proximately caused* by those statements.

In sum, the district court properly dismissed the negligent misrepresentation count. *See Spaulding*, 2012 WL 3025116, at *6.

### E.

Finally, Appellants press their fraud claim. To bring a common law fraud claim, a plaintiff must show, *inter alia*, "that the defendant made a false representation" for "the purpose of defrauding" the plaintiff, and that the plaintiff relied upon the misrepresentation and suffered damages. *Parker*, 604 A.2d at 527. Appellants fail on every element of this claim. Appellants have not plausibly stated a claim that Wells Fargo made false representations, that those alleged false representations were made for the purpose of defrauding Appellants, or that Appellants relied upon the representations and suffered damages as a result.

Moreover, a common law fraud claim is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Appellants have not stated their claim with the required particularity. The district court therefore properly dismissed Appellants' common law fraud claim.

### IV.

For the reasons stated, the judgment of the district court is

*AFFIRMED*.