**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 15-1392**

———————

JACQUELINE GALLOWAY, on her own behalf and on behalf of all
others similarly situated,

Plaintiff - Appellant,

v.

SANTANDER CONSUMER USA, INC.,

Defendant - Appellee.

———————

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Catherine C. Blake, Chief District
Judge.  (1:13-cv-03240-CCB)

———————

Argued:  January 28, 2016          Decided:  April 8, 2016

———————

Before TRAXLER, Chief Judge, and AGEE and WYNN, Circuit Judges.

———————

Affirmed by published opinion.  Chief Judge Traxler wrote the
majority opinion, in which Judge Agee joined.  Judge Wynn wrote
a dissenting opinion.

———————

**ARGUED**: Cory Lev Zajdel, Z LAW, LLC, Reisterstown, Maryland, for
Appellant.  Robert John Brener, LECLAIRRYAN, Newark, New Jersey,
for Appellee.  **ON BRIEF:** Michael von Diezelski, LECLAIRRYAN,
Annapolis, Maryland, for Appellee.

———————

TRAXLER, Chief Judge:

Jacqueline Galloway appeals a district court order dismissing her action against Santander Consumer USA, Inc. seeking damages for breach of contract and alleging a violation of the Maryland Credit Grantor Closed End Credit Provisions (the "CLEC"), see Md. Code, Comm. Law §§ 12-1001, et seq. Finding no error, we affirm.

I.

The pertinent facts in this case are undisputed. Galloway used a loan she obtained through a retail installment contract ("the RISC") to finance her purchase of a vehicle in March 2007. The CLEC governs the RISC's terms.

The RISC contained the transaction's financing terms as well as information concerning repossession rights and procedures. It listed the total amount financed as $22,916.28 and required Galloway to make 72 payments of $487.46 on the 17th day of every month. If a payment or part thereof was more than 15 days late, the RISC called for imposition of a late fee of five dollars or ten percent of the part of the payment that was late, whichever was greater. The RISC also included a modification provision stating that "[a]ny change to this contract must be in writing and we must sign it." J.A. 20.

The RISC was assigned to CitiFinancial Auto, Ltd. ("CitiFinancial"), which took a security interest in the

2

vehicle. Sometime before October 31, 2008, Galloway contacted CitiFinancial requesting a reduction in the amount of her monthly loan payment. The CitiFinancial representative with whom Galloway spoke told her that CitiFinancial would send her paperwork to review and sign and that, once she returned the signed papers, the company would consider whether to approve her request. Galloway stated that CitiFinancial told her they would notify her in writing concerning whether her request had been approved.

CitiFinancial then provided Galloway with a cover page and a two-page document. The cover page asked that she "review the attached documents and provide the signature(s) required." J.A. 25. It requested that after she signed the paperwork, she "return [it] to CitiFinancial Auto for further review, approval and consideration." J.A. 25. It also requested that she "retain a copy of this agreement for [her] records." J.A. 25.

The two remaining pages constituted an amended agreement (the "Amended Agreement"). Under its terms, the Amended Agreement would take effect on October 31, 2008; Galloway's total amount due would be $20,213.50; her monthly payment would be reduced from $487.46 to $365.57; her first payment would be due December 14, 2008; and her last (and seventy-second) payment would be due on November 14, 2014. The Amended Agreement also included an arbitration agreement (the "arbitration agreement")

3

under which Galloway, CitiFinancial, and CitiFinancial's assignees, could elect to arbitrate any dispute, "whether in contract, tort or otherwise," rather than proceed through a court action.[1]  J.A. 26-27.  The arbitration agreement also prohibited Galloway from serving as a class representative or participating in a class action if arbitration was elected. Finally, the Amended Agreement provided that "all terms and provisions of the [RISC] shall remain in full force and effect except as expressly modified herein."  J.A. 26.

Galloway signed the Amended Agreement on November 12, 2008, and sent a copy of the signed agreement to CitiFinancial via fax.

The record does not reflect that CitiFinancial ever specifically sent Galloway written approval of the Amended Agreement.  Nevertheless, Galloway states in her declaration that "sometime after November 14, 2008, CitiFinancial lowered [her] scheduled monthly payments to $366.43," J.A. 17, an amount just 86 cents more than the amount contemplated in the Amended Agreement.  Galloway immediately began making monthly payments of $366.43 beginning December 13, 2008, and continued to make payments in that amount for several years.

---

[1] The arbitration agreement provided that it did not apply to certain types of disputes, but Galloway does not maintain that any of those exceptions applies here.

4

In her declaration, Galloway states that it was an "agreement between [her] and CitiFinancial entered into sometime after November 14, 2008" that lowered her payment amount from $487.46 to $366.43. J.A. 17. However, the record contains no evidence of any specific discussions between Galloway and CitiFinancial explaining or addressing the 86-cent discrepancy. And Galloway's declaration asserts that the agreement that "lowered [her] payments to $366.43 each month was not evidenced by a writing." J.A. 17.

In December 2011, CitiFinancial assigned the security interest in Galloway's vehicle to Santander Consumer USA, Inc. After Galloway fell behind on her payments, Santander repossessed her car, sold it, and, after failing in its attempts to collect the outstanding deficiency, waived the deficiency.

Galloway subsequently brought this action in state court, alleging that Santander breached the RISC and violated the CLEC by failing to provide sufficient notice before selling her vehicle. Galloway purports to bring suit on behalf of herself and all persons similarly situated.

Santander removed the case to federal district court. Santander also filed a motion to compel arbitration and stay federal district court proceedings under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., claiming Galloway had previously agreed to arbitrate any disputes concerning her loan.

5

Galloway denied that the parties had an agreement to arbitrate and alternatively claimed that any arbitration agreement was unenforceable under the FAA because it was not in writing. Galloway also moved to amend her complaint, and Santander opposed the motion on the basis that amendment would be futile.

Applying a summary-judgment-like standard, the district court concluded as a matter of law that Galloway had agreed to arbitration and that the agreement to arbitrate was enforceable under the FAA. See Galloway v. Santander Consumer USA, Inc., Civ. No. CCB-13-3240, 2014 WL 4384641 (D. Md. Sept. 3, 2014). The district court analyzed several alternative legal theories offered by Santander as support for its position that the parties agreed to arbitration. The court concluded that CitiFinancial's sending the Amended Agreement to Galloway was a mere invitation for Galloway to make an offer because the company retained the right at that time to reject Galloway's refinancing application even if Galloway signed the agreement. See id. at *3. However, the court concluded that Galloway's returning a copy of the executed agreement constituted an offer to enter into the agreement and that CitiFinancial accepted that offer by reducing her monthly payment to only 86 cents more than the agreement had called for. See id.

Alternatively, the court concluded that CitiFinancial's proposal to reduce the payment to $366.43 constituted a

6

counteroffer to make a minor modification to the dollar amounts in the Amended Agreement, which Galloway accepted by making the payments in the amount requested for several years without objection. See id. The district court rejected Galloway's argument that no new contract was formed because Galloway's returning a signed original of the Amended Agreement to CitiFinancial and CitiFinancial's written assent were both conditions precedent to modifying the RISC. See id. at *4. The district court concluded that the parties waived any right they may have had to such formalities by virtue of their performance under their new agreement. See id. The court added that, under the doctrine of equitable estoppel, Galloway could not disclaim the Amended Agreement, having accepted the benefit of the agreement in the form of reduced monthly payments. See id.

Having determined that the parties bound themselves to the terms of the Amended Agreement, or at least to the terms of the Amended Agreement with the slightly modified payment amount, the court concluded that the written arbitration agreement was enforceable under the FAA.[2] See id. at *3 n.4. On that basis, the court initially granted Santander's motion to compel arbitration and stayed the case pursuant to 9 U.S.C. § 3. See

---

[2] The court also concluded that Galloway's proposed amendment of her complaint would be futile. See Galloway v. Santander Consumer USA, Inc., Civ. No. CCB-13-3240, 2014 WL 4384641, at *5 (D. Md. Sept. 3, 2014).

7

id., at *5.  However, on reconsideration, the court, citing Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc., 252 F.3d 707, 709-10 (4th Cir. 2001), entered a final judgment dismissing the case so as to allow Galloway to pursue an immediate appeal.

## II.

"We review de novo the district court's judgment compelling arbitration, as well as any questions of state contract law concerning the validity of the arbitration agreement."  Santoro v. Accenture Fed. Servs., LLC, 748 F.3d 217, 220 (4th Cir. 2014).

"Sections 3 and 4 [of the FAA] . . . provide two parallel devices for enforcing an arbitration agreement:  a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4."  Chorley Enters. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 563 (4th Cir. 2015) (alteration and internal quotation marks omitted).  Before the FAA was enacted, "courts were hostile to the enforcement of arbitration provisions, following a long-standing common law rule which evolved from the judiciary's jealous refusals to oust courts of jurisdiction in favor of other dispute resolution mechanisms."  Whiteside v. Teltech Corp., 940 F.2d 99, 101 (4th Cir. 1991).  "The purpose for enacting the FAA was to assure judicial enforcement of

8

privately made agreements to arbitrate by placing them upon the same footing as other contracts." Id. (internal quotation marks omitted). This purpose is served by the cause of action the FAA provides and its "primary substantive provision," Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983), declaring, with exceptions not relevant here, that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable.

9 U.S.C. § 2.

We have stated that "[a]pplication of the FAA requires demonstration of four elements: '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" Rota-McLarty v. Santander Consumer USA, Inc., 700 F.3d 690, 696 n.6 (4th Cir. 2012) (quoting Whiteside, 940 F.2d at 102).

Only the second element is at issue here. Galloway does not dispute that the present action falls within the scope of the arbitration agreement, but she argues that the district

9

court erred in concluding, without the benefit of a jury trial, that the provision was a term of any contract she and CitiFinancial entered into. She also alternatively maintains that if the arbitration agreement was a term of a contract the parties entered into, the district court erred in ruling that their acceptance of that provision satisfied the FAA's writing requirement. We address these issues seriatim.

A.

We first address Galloway's contention that she is entitled to a jury trial regarding whether she and CitiFinancial entered into a binding contract that included the arbitration agreement.

Under the FAA, "the party seeking a jury trial must make an unequivocal denial that an arbitration agreement exists – and must also . . . provide sufficient evidence in support of its claims such that a reasonable jury could return a favorable verdict under applicable law." Chorley Enters., 807 F.3d at 564. Thus, "to obtain a jury trial, the parties must show genuine issues of material fact regarding the existence of an agreement to arbitrate."[3] Id. We conclude that the district court properly ruled that no such factual issue existed here.

---

[3] We have noted that "[t]his standard is akin to the burden on summary judgment." Chorley Enters. v. Dickey's Barbecue Rests., 807 F.3d 553, 564 (4th Cir. 2015).

10

The parties agree that principles of Maryland law control the question of whether they reached an agreement to arbitrate. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter . . ., courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."); see Chorley Enters., 807 F.3d at 563.

Under Maryland law, a prerequisite to the formation of a contract is mutual assent between the parties. See Cochran v. Norkunas, 919 A.2d 700, 708 (Md. 2007). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." Id.

"A contract is formed when an unrevoked offer made by one person is accepted by another." County Comm'rs for Carroll Cnty. v. Forty W. Builders, Inc., 941 A.2d 1181, 1209 (Md. Ct. Spec. App. 2008) (internal quotation marks omitted). "An 'offer' is the 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" Prince George's Cnty. v. Silverman, 472 A.2d 104, 112 (Md. Ct. Spec. App. 1984). Importantly, an acceptance may be manifested by actions as well as by words. See Porter v. General Boiler Casing Co., 396 A.2d 1090, 1095 (Md. 1979) ("The

11

purpose of a signature is to demonstrate 'mutuality or assent' which could as well be shown by the conduct of the parties.").

As it did below, Santander offers several theories concerning how a meeting of the minds occurred here. Santander first argues that CitiFinancial's sending Galloway the Amended Agreement for her signature amounted to an offer to enter the agreement and that Galloway's signing it and faxing a copy to CitiFinancial constituted her acceptance of the Amended Agreement. Just as the district court did, we reject this argument because CitiFinancial made clear to Galloway, both orally and in writing, that it retained the right to deny Galloway's request for lower monthly payments. Since CitiFinancial had not agreed that Galloway's execution of the Amended Agreement would bind the parties, the sending of the agreement to Galloway for her signature was a mere invitation to Galloway to make an offer. See Spaulding v. Wells Fargo Bank, N.A., 714 F.3d 769, 778 (4th Cir. 2013) ("[W]hen some further act of the purported offeror is necessary, the purported offeree has no power to create contractual relations, and there is as yet no operative offer." (internal quotation marks omitted)). Thus, Galloway's execution of the Amended Agreement and her sending of a copy of the signed document to CitiFinancial constituted not an acceptance of an offer made to her, but rather an offer to CitiFinancial to enter into the agreement.

12

Santander alternatively contends that the district court correctly ruled that CitiFinancial accepted Galloway's offer by lowering the amount of Galloway's monthly payment to 86 cents more than the amount the Amended Agreement specified, a difference described by the district court as "de minimis." Galloway, 2014 WL 4384641, at *3. Galloway argues, however, that CitiFinancial's actions did not constitute an acceptance of her offer because, under Maryland law, any variation from the terms offered is considered to be a conditional acceptance or counteroffer, as opposed to an unconditional acceptance that would immediately create a binding agreement.[4]

Even assuming arguendo that Galloway is correct that CitiFinancial's actions did not bind the parties to an agreement, we agree with the district court's alternative ruling that CitiFinancial's actions proposing payments in an amount 86 cents more than the amount specified in the Amended Agreement constituted a counteroffer to modify the terms of the Amended Agreement in this minor way and that Galloway accepted the counteroffer by making the payments in this slightly increased amount.

---

[4] Galloway also argues that the fact that CitiFinancial charged her a late fee on November 3 in accordance with the terms of the RISC demonstrated, for several reasons, that CitiFinancial had not accepted the terms of the Amended Agreement by that date.

13

Although Galloway contends that the question of whether a meeting of the minds occurred presented a genuine factual dispute, we conclude that the legal consequences of the parties' undisputed actions are clear. When Galloway first inquired about lowering the amount of her monthly payment, CitiFinancial drafted the Amended Agreement and instructed her that if she signed it and returned it, the company would review her request. Galloway indicated her assent to the company's proposed terms when she executed the Amended Agreement on November 12, leaving CitiFinancial to undertake its formal review process. Within approximately one month, at some time early enough to allow Galloway to make her December payment in the new amount, CitiFinancial informed Galloway that it would lower Galloway's payment to $366.43, almost the exact amount that the Amended Agreement had contemplated. On these facts, CitiFinancial could not reasonably be understood to be offering Galloway the option to her lower payment amount without accepting the other new terms specified in the Amended Agreement – such as, for example, the increase in the number of payments that Galloway would be required to make. Rather, CitiFinancial could only be reasonably understood to be proposing a very minor tweak to the terms that it had originally suggested and that Galloway had already indicated she would accept. See Learning Works, Inc. v. Learning Annex, Inc., 830 F.2d 541, 543 (4th Cir. 1987)

14

("Maryland law . . . requires unqualified acceptance of an offer before a contract can be formed. If a purported acceptance varies from the terms of the offer, then it does not operate as an acceptance, but rather as a rejection of the offer and a counteroffer.").[5]

There is no evidence that Galloway ever <u>explicitly</u> agreed to accept this small modification to the Amended Agreement. Nevertheless, her making payment in the revised amount CitiFinancial requested and then continuing to make those payments for several years without complaint can only be interpreted as an assent to the terms of the Amended Agreement as slightly modified by the company. See <u>Restatement (Second) of Contracts</u> § 19(2) ("The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in

---

[5] We note that the record does not reflect whether CitiFinancial's communication to Galloway informing her that it would lower her payment to $366.43 was oral or in writing. Galloway's declaration states that the agreement that "lowered [her] payments to $366.43 was not evidenced by a writing." J.A. 17. It is unclear whether Galloway meant that CitiFinancial informed her orally that it would lower her payment to that amount or rather merely that there was no writing setting out all of the terms of the parties' new agreement. Regardless, the means by which CitiFinancial informed Galloway of the amount of her new monthly payment is not material to our decision.

Additionally, although the reason for the 86-cent increase is also not material to our decision, the increase may be attributable to a late fee of $48.74 imposed on November 3, 2008, when Galloway failed to make her October payment in a timely manner, which increased the total amount she owed on her loan.

15

the conduct and knows or has reason to know that the other party may infer from his conduct that he assents."); see also Cochran, 919 A.2d at 714 (indicating that offeree's silence can constitute acceptance if the offeree has accepted the benefit of the offer); Restatement (Second) of Contracts § 53(3) (cmt. b) (1981) (noting that offeree may guard against the risk that his performance will constitute an unintended acceptance; he can simply communicate to the offeror that he does not intend to assent). This was not a case, after all, in which the parties were engaging in back-and-forth negotiation over what the terms of a new agreement would be. Galloway asked CitiFinancial if it would modify the RISC to lower her required monthly payment amount. In the context of the parties' dealings, it was CitiFinancial's decision whether it would agree to do so, and, if so, what new terms it would accept. Then Galloway would decide whether she would also accept those terms. CitiFinancial initially proposed terms in an Amended Agreement that it would consider if Galloway returned the signed document to the company. When, after its formal review process, CitiFinancial proposed a slight change in the dollar amounts, Galloway assented to that change as well.

Galloway argues that, under Maryland law, the parties could not validly modify the RISC without setting out all of the new terms together in a written document and signing the document.

16

In support of her argument, Galloway maintains that a signature on a contract is a condition precedent if "the terms of the contract make the parties' signatures a condition precedent to the formation of the contract." All State Home Mortg., Inc. v. Daniel, 977 A.2d 438, 447 (Md. Ct. Spec. App. 2009); see also Chirichella v. Erwin, 310 A.2d 555, 557 (Md. 1973) (explaining that a condition precedent is "a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises") (internal quotation marks omitted). While that legal proposition is correct, no term in the Amended Agreement indicated that CitiFinancial's signature was necessary to bind the parties, and Galloway does not contend otherwise.

Galloway does not suggest that when CitiFinancial agreed to reduce her payment to $366.43, the company indicated that any further paperwork would be forthcoming or that any additional signatures would be needed to complete the parties' modification of the terms of the RISC. All CitiFinancial sought from Galloway was payment in the new amount. By making her December payment in that amount and continuing to make payments in that amount for several years, she accepted the terms CitiFinancial had offered. See Porter, 396 A.2d at 1095; Restatement (Second) of Contracts § 30(2) (1981) ("Unless otherwise indicated by the

17

language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.").

The only contractual language Galloway cites as the basis for her position that a written agreement signed by both parties was necessary to effectively modify the RISC is the language in the RISC itself stating that any future amendment would need to be by a signed writing. However, under Maryland law, contractual limitations on future modifications are not effective to prevent parties from entering into new agreements orally or by performance; rather, they only provide context for interpreting subsequent conduct. See Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC, 25 A.3d 967, 978-83 (Md. 2011) (Maryland "caselaw shows a persistent unwillingness to give dispositive and preclusive effect to contractual limitations on future changes to that contract . . . whether it is mutual modification, novation, waiver of remedies, or . . . a waiver of condition precedent"); University Nat'l Bank v. Wolfe, 369 A.2d 570, 576 (Md. 1977) (holding that parties may modify their original agreement by their conduct "notwithstanding a written agreement that any change to a contract must be in writing"); see also Porter, 396 A.2d at 1095 (explaining that formation of a contract does not require the parties' signatures "unless the parties have made them necessary at the time they

18

expressed their assent and as a condition modifying that assent"
(emphasis added and internal quotation marks omitted)).

Here, as we have explained, the parties left no doubt that they intended to modify the terms of the RISC, even in the absence of a signed writing memorializing all of the new terms to which they agreed. Having led CitiFinancial to believe for many years that the parties had successfully amended the RISC even without a signed writing – and having accepted the benefit of the modification in the form of substantially lower monthly payment requirements – Galloway cannot now be heard to claim that there was no valid amendment in the absence of a signed writing. See Hovnanian, 25 A.3d at 979 (waiver of a provision requiring amendments to a contract to be in writing may be by express agreement or by implication).[6] Accordingly, the district

---

[6] Additionally, because the parties agreed on a monthly payment of $366.43, the terms to which the parties manifested assent were sufficiently definite. Galloway argues that there was some uncertainty regarding the date that monthly payments were due, but that is not correct. The Amended Agreement plainly provided that Galloway's payments were due on the 14th of every month. Galloway contends that CitiFinancial changed this date, as evidenced by the fact that the RISC provided that late fees would be incurred if payments were more than 15 days late, yet after December 2008, CitiFinancial often imposed late fees 15 days, rather than 16 days, after the due date. However, CitiFinancial had often been charging late fees exactly 15 days after the payment due date since the initiation of the loan. Regardless of whether that was proper under the parties' agreements, the continuation of that practice after December 2008 was no indication that the payment due date had somehow changed from that provided in the Amended Agreement.

court properly concluded that the arbitration agreement was a term of a contract that the parties entered into.

B.

In addition to her state-law arguments, Galloway also maintains that any arbitration agreement that the parties entered into is not enforceable under the FAA. We disagree.

The FAA declares, with exceptions not relevant here, that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable.

9 U.S.C. § 2. We have stated that "[a]pplication of the FAA requires demonstration of," among other things, "a written agreement that includes an arbitration provision which purports to cover the dispute." Rota-McLarty, 700 F.3d at 696 n.6 (internal quotation marks omitted). As we have explained, the record demonstrates as a matter of law that Galloway, by making payments in the amount CitiFinancial requested, bound herself to the terms of the written Amended Agreement, with a slight modification in the dollar amounts that is not included in the writing. The question this case presents is whether the fact that the Amended Agreement, and specifically the arbitration agreement, were in writing was sufficient to satisfy the FAA's writing requirement, or rather, whether the parties' non-written

20

modification of a separate term of the agreement rendered the arbitration agreement unenforceable. We conclude that the writing requirement was satisfied.

The "written arbitration agreement" that is necessary to bring an agreement within the FAA's scope is an "actual document—the physical embodiment of the underlying legal obligations" and need not include any written assent to those obligations. Seawright v. American Gen. Fin. Servs., 507 F.3d 967, 978-79 & nn.5-7 (6th Cir. 2007) (holding that FAA's writing requirement was satisfied when pamphlet distributed to employees contained arbitration provision and stated that an employee's continuing employment would constitute acceptance of the procedures); see In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 281 n.5 (4th Cir. 2007) (holding that when agreement to arbitrate was incorporated under the UCC into terms of oral contracts because it was established that arbitration is a usage of trade, and subsequent written confirmations containing the details of the arbitration terms became part of the contract by operation of law, the confirmations satisfied the FAA's writing requirement); Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1369 (11th Cir. 2005) (holding FAA's writing requirement was satisfied when, "[a]lthough the employees' acceptance was by continuing their employment and was not in writing, all material terms – including the manner of acceptance – were set forth in

21

the written" dispute resolution policy); <u>International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH</u>, 206 F.3d 411, 416 (4th Cir. 2000) ("While a contract cannot bind parties to arbitrate disputes they have not agreed to arbitrate, it does not follow that under the Federal Arbitration Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision.  Rather, a party can agree to submit to arbitration by means other than personally signing a contract containing an arbitration clause." (alterations & internal quotation marks omitted)); <u>Fisser v. International Bank</u>, 282 F.2d 231, 233 (2d Cir. 1960) ("[T]he [FAA] contains no built-in Statute of Frauds provision but merely requires that the arbitration provision itself be in writing.  Ordinary contract principles determine who is bound by such written provisions." (footnote omitted)).  Because the arbitration agreement was in writing and Galloway assented to be bound by that agreement when she made payments in the amount CitiFinancial requested, it does not matter, for purposes of enforceability under the FAA, that she also assented to other terms that may not have been in writing.  Stated another way, although no writing documented CitiFinancial's minor change to the Amended Agreement's dollar amounts, the parties were not required to draft an integrated writing documenting this minor change in order to make the written arbitration agreement

22

enforceable under the FAA. See Medical Dev. Corp. v. Industrial Molding Corp., 479 F.2d 345, 348 (10th Cir. 1973) ("[I]t [is] not necessary that there be a simple integrated writing or that a party sign the writing containing the arbitration clause. All that is required is that the arbitration provision be in writing." (citations omitted)). The district court was therefore correct to enforce the arbitration agreement.

## III.

In sum, because we conclude that the district court correctly enforced the parties' arbitration agreement, we affirm the district court order dismissing Galloway's action.

AFFIRMED

WYNN, Circuit Judge, dissenting:

The question at the heart of this appeal is whether the parties formed a written agreement to arbitrate. Santander says yes, pointing to a (problematic) amendment document with an arbitration clause; Galloway says no, declaring that the operative modification contract was never reduced to writing. In short, the parties dispute a material fact: whether they entered into a written agreement to submit disputes to arbitration. It therefore cannot accurately be said that "[t]he pertinent facts in this case are undisputed." Ante at 2. A jury—not a court—should resolve this dispute. Accordingly, I dissent.

I.

Galloway, a Maryland consumer, bought a car in 2007, and her loan was initially assigned to CitiFinancial. Under the financing contract, Galloway was required to make 72 monthly payments of $487.46. J.A. 19. The original contract contained no arbitration provision. It did, however, include a provision requiring changes to be in writing and signed to be binding: "**Any change to this contract must be in writing and we must sign it. No oral changes are binding.**" J.A. 20 (emphasis added). No one disputes the original contract's validity.

The same cannot be said of a purported amendment to the agreement dating to 2008: The dispute surrounding its validity

is at the center of this appeal. Galloway contacted CitiFinancial and requested that her monthly payments be reduced. In response, CitiFinancial sent Galloway a fax letter and an "Amendment Agreement" and instructed her to sign the "Amendment Agreement" and return it to CitiFinancial for "review, approval and consideration." J.A. 25. The "Amendment Agreement" proposed monthly payments of $365.57 and included an arbitration provision. J.A. 26.

Galloway signed the Amendment Agreement and faxed it back to CitiFinancial. But CitiFinancial never signed the Amendment Agreement. And for months, Galloway made, and CitiFinancial, and later its assignee Santander, the defendant here, accepted monthly payments of $366.43—not the $365.57 in the Amendment Agreement. In fact, Santander's spreadsheet for Galloway's account listed as her requisite payment amount "$366.43"—not the $365.57 in the Amendment Agreement.

Ultimately, Galloway failed to make her monthly payments, and Santander repossessed and sold her car. Galloway sued in Maryland state court, alleging that Santander failed to give notice as required under the Credit Grantor Closed End Credit Provisions of the Maryland Credit Deregulation Act. Galloway also declared in an affidavit that CitiFinancial "told me that the paperwork provided to me was not pre-approved . . . and that

25

**someone within CitiFinancial would have to approve my request before it became effective**." J.A. 16 (emphasis added).

Galloway further declared, under penalty of perjury, that "**CitiFinancial did not accept the terms of the executed Amendment Agreement**" and that "**[t]he agreement between myself and CitiFinancial . . . which lowered my payments to $366.43 each month was not evidenced by a writing**." J.A. 17 (emphasis added).[1] Santander proffered no evidence affirmatively refuting Galloway's statements, instead declaring that it had simply "relied upon the accuracy of the [original financing contract] and the Amendment Agreement." J.A. 31.

Santander removed the case to federal court and then moved to compel arbitration. The district court granted the motion, holding that a written arbitration agreement existed.

## II.

Where a party "show[s] genuine issues of material fact regarding the existence of an agreement to arbitrate," a standard we have likened to "the burden on summary judgment," that party is entitled to a jury trial on the issue. Chorley Enters. v. Dickey's, 807 F.3d 553, 564 (4th Cir. 2015). And we review a district court's judgment compelling arbitration de

---

[1] It is, therefore, inaccurate to suggest that the record contains "no evidence," ante at 5, of discussions between Galloway and CitiFinancial.

26

novo. <u>Santoro v. Accenture Fed. Servs., LLC</u>, 748 F.3d 217, 220 (4th Cir. 2014).

In my view, this case presents a straightforward factual dispute entitling Galloway to a jury trial. Galloway contends that the amendment to the original contract was not reduced to writing. Evidence supporting Galloway's version of the facts includes: (1) her sworn statement, including her averment that "[t]he agreement between myself and CitiFinancial . . . which lowered my payments to $366.43 each month was not evidenced by a writing," J.A. 17; (2) the fact that the actual amount of Galloway's lowered payments differed from the amount stated in the purported Amendment Agreement; (3) Santander's admission in its declaration that it simply relied on the accuracy of the documents; (4) the fact that the original contract clearly contemplated non-written amendments—because it stated that only written and signed amendments would be binding; and (5) the fact that CitiFinancial never signed the Amendment Agreement as required under the original contract.

Santander, by contrast, contends that in sending Galloway the Amendment Agreement—which required "review, approval and consideration" by CitiFinancial, J.A. 25—CitiFinancial made Galloway an offer, which she accepted when she faxed the signed document back. Santander also argues, for example, that the difference in amount between the payments Galloway actually made

27

and the payments she was required to make under the Amendment Agreement was simply de minimis and that the discrepancy was either ratified or waived.[2]  While Santander's arguments may not all be frivolous,[3] I simply cannot agree that they lead to the conclusion that "CitiFinancial could only be reasonably understood to be proposing a very minor tweak to the terms that it had originally suggested and that Galloway had already indicated she would accept."  Ante at 14.

Instead, this is a classic case of he said/she said. Galloway claims that the parties' ultimate agreement to lower her monthly payments was never reduced to writing.  Santander

---

[2] I am confounded by the way in which the majority opinion invokes waiver here.  Plainly, "[t]he parties left no doubt that they intended to modify the terms of the RISC, even in the absence of a signed writing to which they agreed."  Ante at 19. And indeed, Galloway does not contest **that** the parties agreed to a modification; she instead contests **how** they did so, disputing that the modification took the form of a written document containing an arbitration provision.  Waiver is thus plainly misplaced and certainly does not lead to the conclusion that "the district court properly concluded that the arbitration agreement was a term of the contact that the parties entered into."  Ante at 20.

[3] I agree with the majority's rejection of Santander's argument that, in faxing the Amendment Agreement to Galloway, CitiFinancial made her an offer.  I also note that not a single reported Maryland case engages in the "de minimis" analysis featured in Santander's brief and the court's analysis.  On the contrary, the case law suggests that **any** discrepancy between an offer and a purported acceptance results in no contract being formed.  See, e.g., Learning Works, Inc. v. The Learning Annex, Inc., 830 F.2d 541, 543 (4th Cir. 1987) ("Maryland law, which applies in this case, requires unqualified acceptance of an offer before a contract can be formed." (citations omitted)).

claims that the Amendment Agreement document constitutes the operative agreement to reduce payments. Without doubt, what the parties agreed to—and whether it is memorialized by a writing—is material. It is plainly disputed. And it is a question for the jury, not the courts.

## III.

Where a party "show[s] genuine issues of material fact regarding the existence of an agreement to arbitrate," that party is entitled to a jury trial. <u>Chorley Enters.</u>, 807 F.3d at 564. In my view, Galloway has done just that—shown a material fact in dispute. She is entitled to have a jury decide the dispute. With much respect to my colleagues in the majority, I therefore dissent.