PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 16-3069

————————————

GINNINE FRIED

v.

JP MORGAN CHASE & CO;
JP MORGAN CHASE BANK NA, d/b/a/ Chase,
                                    Appellants

————————————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 2-15-cv-02512)
District Judge: Honorable Madeline C. Arleo

————————————

Argued January 18, 2017

Before: AMBRO, VANASKIE, and SCIRICA, Circuit Judges

(Opinion filed: March 9, 2017)

Leonard A. Gail, Esquire
Paul Berks, Esquire
Massey & Gail

50 East Washington Street, Suite 400
Chicago, IL   60602

Jonathan S. Massey, Esquire        (Argued)
Massey & Gail
1325 G Street, N.W., Suite 500
Washington, DC   20005

Counsel for Appellants

Robert M. Brochin, Esquire
Morgan Lewis & Bockius
200 South Biscayne Boulevard
5300 Southeast Financial Center
Miami, FL   33131

Allyson N. Ho, Esquire
Morgan Lewis & Bockius
1717 Main Street, Suite 3200
Dallas, TX   75201

Judd E. Stone, Esquire
Morgan Lewis & Bockius
2020 K Street, N.W.
Washington, DC   20006

Counsel for Amicus Appellants:
American Bankers Association;
Consumer Mortgage Coalition;
Housing Policy Council;
Independent Community Bankers of America;
Mortgage Bankers Association

James E. Cecchi, Esquire
Lindsey H. Taylor, Esquire
Carella Byrne Cecchi Olstein Brody & Agnello
5 Becker Farm Road
Roseland, NJ   07068

Antonio Vozzolo, Esquire          (Argued)
345 Route 17 South
Upper Saddle River, NJ   07458

       Counsel for Appellee

_____

OPINION
_____

AMBRO, Circuit Judge

Ginnine Fried bought a home in 2007 for $553,330. It was near high tide in the real estate market, but she had to believe she was getting a bargain, as an appraisal estimated the home's value to be $570,000. Fried borrowed $497,950 at a fixed interest rate to make her purchase and mortgaged the home as collateral. Because the loan-to-purchase-price ratio ($497,950 / $553,330) was more than 80%, JPMorgan Chase Bank, N.A. ("Chase"), the servicer for Fried's mortgage (that is, the entity who performs the day-to-day tasks for the loan, including collecting payments), required her to obtain private mortgage insurance. Fried had to pay monthly premiums for that insurance until the ratio reached 78%; in other words, the principal of the mortgage loan needed to reduce to $431,597, which was projected to happen just before March 2016.

3

We now know that the housing market crashed in 2008, and the value of homes dropped dramatically. Fried, like many homeowners, had trouble making mortgage payments. Help came when Chase modified Fried's mortgage under a federal aid program by reducing the principal balance to $463,737. The rub was that Chase extended Fried's mortgage insurance premiums an extra decade to 2026. Whether it could do this depends on how we interpret the Homeowners Protection Act ("Protection Act"), 12 U.S.C. § 4901 *et seq.* Does it permit a servicer to rely on an updated property value, estimated by a broker, to recalculate the length of a homeowner's mortgage insurance obligation following a modification or must the ending of that obligation remain tied to the initial purchase price of the home? We conclude the Protection Act requires the latter.

## I.    BACKGROUND

Mortgage insurance protects the owner or guarantor of mortgage debt—typically the Federal National Mortgage Association ("Fannie Mae") or Federal Home Loan Mortgage Corporation ("Freddie Mac")—from a borrower's risk of default. Traditional underwriting standards require homebuyers to pay at least 20% of a home's purchase price in cash—that is, they require the homebuyer to obtain 20% equity in the home at the time of purchase and finance 80% of the home's purchase price. If homebuyers cannot pay at least 20%, then they must purchase mortgage insurance. Once the balance due on a home loan falls below 80% of the home's purchase price, mortgage insurance is no longer necessary because "excessive [mortgage insurance] coverage does not benefit the homeowner . . . and provides little extra protection to a lender." S. Rep. No. 105-129, at 3 (1997).

Before Congress took action by passing the Protection Act in 1997, many lenders would continue to collect

4

mortgage insurance payments after a homeowner had gone below the 80% loan-to-value mark. H.R. Rep. No. 105-55, at 6 (1997). In the Act Congress set national standards for mortgage insurance termination. It requires mortgage servicers to (1) provide periodic notices to a borrower/mortgagor[1] regarding mortgage insurance obligations, (2) automatically terminate mortgage insurance on a statutorily defined schedule, and (3) grant a borrower's request to cancel her mortgage insurance once certain conditions are met. 12 U.S.C. §§ 4901-03.

Under the Protection Act, mortgage servicers must automatically terminate mortgage insurance for a fixed-rate loan like Fried's on "the date on which the principal balance of the mortgage . . . is first scheduled to reach 78 percent of the original value of the property securing the loan." 12 U.S.C. § 4901(18)(A). The "original value" of a home is "the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated." 12 U.S.C. § 4901(12). As noted, the purchase price of Fried's home was less than its appraised value, so her home's "original value" is $553,330. Seventy-eight percent of that figure—the key value for mortgage insurance termination—is $431,597.40. Under her loan's amortization schedule, Fried's unpaid principal balance was set to reach $431,597.40 just before March 1, 2016, and therefore her mortgage insurance obligation would terminate on that date.

---

[1] The Protection Act defines "mortgagor" as the "original borrower under a residential mortgage or his or her successors or assignees." 12 U.S.C. 4901(11). We therefore use "borrower," "mortgagor," and "homeowner" interchangeably throughout this opinion.

5

When Fried ran into financial trouble following the financial crisis of 2008, she and Chase agreed on January 10, 2011, to modify her mortgage under the Home Affordable Mortgage Program ("HAMP"). The HAMP was enacted as part of the Emergency Economic Stabilization Act of 2008 in response to the financial and housing crisis of that time. *See Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 772 (4th Cir. 2013). Under the HAMP, participating mortgage "servicers agreed to identify homeowners who were in default or would likely soon be in default on their mortgage payments, and to modify the loans of those eligible under the program. In exchange, servicers would receive a $1,000 payment for each permanent modification, along with other incentives." *Id.* at 773 (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012)). Per the modification agreement she reached with Chase, the principal balance of Fried's loan was reduced to $463,736.98.

The Protection Act provides for the treatment of mortgage modifications in 12 U.S.C. § 4902(d):

> If a mortgagor and mortgagee (or holder of the mortgage) agree to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, termination date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan.

Accordingly, Chase was required to update Fried's termination date to reflect the "modified terms and conditions" to which the parties "agree[d.]" Pursuant to the loan's modified amortization schedule (modified, that is, to account for the reduced principal), Fried's outstanding principal balance would reach 78% of her home's original value ($431,597) in July 2014. Compl. ¶¶ 47, 50.

6

After receiving the modification, Fried asked Chase when she would be relieved of her obligation to make monthly mortgage insurance payments. On August 31, 2012, Chase responded that her mortgage insurance obligation would automatically terminate on November 1, 2026. This date was *ten years* later than her mortgage insurance termination date before the modification and *twelve years* later than the recalculated date based on her decreased principal balance. Her monthly mortgage insurance premium is approximately $252.83, so a ten-year extension of those premiums would cost her an additional $30,339.60. *See* Compl. ¶ 6.

With this in mind, Fried wrote Chase to question the new termination date and ask how the bank reached its conclusion. It responded on October 10, 2012, and April 9, 2013, stating that November 1, 2026, is "when the loan will reach 78% based on the modified terms and conditions." Compl. ¶ 53. Seventy-eight percent of what exactly Chase did not say, so Fried wrote again.

Chase's response on October 4, 2013, clarified how it arrived at the 2026 termination date. In order to participate in the HAMP program, it was required to obtain a Broker's Price Opinion ("BPO") estimating the value of Fried's home at the time of the modification. A BPO is a much less rigorous estimate of a property's market value than is an appraisal. *See In re Thomas*, 344 B.R. 386, 393 (Bankr. W.D. Pa. 2006) ("Full appraisals, not just the 'drive by' Broker's Price Opinion, are used . . . when the matter is contested."); *see also In re Kasbee*, 466 B.R. 719, 723 (Bankr. W.D. Pa. 2010) (bank "realized that the comparables utilized in the BPO were inadequate and that as a result it was obtaining a full appraisal to determine the true value").

In any event, Chase explained that it had substituted its BPO of $420,000 for the home's $553,330 original value. Because the BPO was much smaller, Fried would not pay down her outstanding principal balance to 78% of the BPO (78% x $420,000 = $327,600) until November 1, 2026.

It is worth pausing for a moment to understand the math behind Chase's purported extension of Fried's mortgage insurance obligation. Remember that the mortgage insurance obligation ends when Fried has paid down the principal balance owed on her mortgage to 78% of her home's original value. That is, she must pay down her mortgage balance to 78% of $ 553,330, which is $431,597.

In this way, the Protection Act's mortgage insurance termination date sets a finish line that homeowners go toward by paying down their mortgage debts. Fried started with a mortgage debt of $497,950 and would reach her finish line once the outstanding principal debt was $431,597. Put differently, she would cross this threshold after making $66,353 of payments toward her mortgage's principal balance, which, according to her initial amortization schedule, she would do in 2016. When her mortgage was modified, Fried leapt forward toward her goal: the modification decreased her outstanding principal balance to $463,737, so she would reach the $431,597 finish line sooner, in 2014, by making just $32,140 in principal payments. But when Chase substituted the BPO for the original value of Fried's home, it moved the finish line. Seventy-eight percent of the $420,000 BPO is $327,600. According to her modified amortization schedule, Fried would not pay down her mortgage debt to Chase's new $327,600 finish line—more than $136,137 in mortgage principal payments away—until 2026.

In April 2015, Fried filed a complaint on behalf of herself and similarly situated individuals. She asserted that by

8

relying on the BPO to calculate her mortgage insurance termination date, rather than her home's original value, Chase violated the Protection Act. Chase filed a motion to dismiss, contending that its substitution of the BPO for the original value did not violate the Protection Act and that Fried's action was barred by the Act's two-year statute of limitations.[2]

The District Court denied Chase's motion but certified its appeal to our Court, recognizing that whether Chase violated the Protection Act is a controlling question of law with substantial ground for difference of opinion that is likely to advance this case's resolution. *See* 28 U.S.C. § 1292(b); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974) (*en banc*). We agreed to hear the appeal.

## II.    ANALYSIS

Chase contends that it was entitled to recalculate Fried's termination date by substituting the BPO it obtained at the time of the modification for her home's original value. It equivocates on whether it could do this only because of certain HAMP rules or whether the Protection Act would permit the substitution more generally. In either case Chase is

---

[2]    The complaint names both Chase and its parent company, JPMorgan Chase & Co. ("JPMC"), as defendants. While the District Court did not address the issue in its opinion, parent companies are not, merely by dint of ownership, liable for the acts of their subsidiaries. *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001). At oral argument, Fried's counsel acknowledged that the complaint did not allege any wrongdoing by JPMC itself and that the claims against JPMC should be dismissed. Oral Argument Jan. 18, 2017, at 25:10-13.

9

wrong: the Protection Act required calculation of Fried's termination date on the basis of her home's original value, which under the Act is its purchase price.

Whether Fried knew or should have known of Chase's violation of the Protection Act outside of the statute-of-limitations period is not clear on the face of her complaint, and thus the District Court was correct not to dismiss on this ground.

### A. The Homeowners Protection Act

#### 1. The Statute's Text

Under the Protection Act a homeowner's obligation to pay mortgage insurance premiums ends on the "termination date if, on that date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction[.]" 12 U.S.C. § 4902(b)(1). For a fixed-rate mortgage, like Fried's, the termination date is

> the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan[.]

12 U.S.C. § 4901(18)(A). Simply put, a homeowner's termination date is when she will have paid down her loan's principal balance to the point that it equals 78% of her home's

10

original value.[3] All agree that the original value of Fried's home in 2007 was its purchase price of $553,330.

When Fried and Chase agreed to modify her mortgage in 2011, another provision of the Protection Act came into play. Section 4902(d) provides that "[i]f a mortgagor and mortgagee . . . agree to a modification of the terms or conditions of a loan . . . [, the] termination date . . . shall be recalculated to reflect the modified terms and conditions of such loan." The process envisioned by § 4902(d) is that we ask which terms or conditions of Fried's loan she and Chase agreed to modify; then we recalculate her termination date to reflect the modified terms and conditions.

Recall that to calculate initially the termination date for mortgage insurance payments we must determine when the principal balance of the mortgage is first scheduled to reach 78% of the original value of the property securing the loan. 12 U.S.C. § 4901(18). There is no question that Fried's agreement with Chase modified the outstanding principal balance of her mortgage by reducing it to $463,737, so her termination date needed to be recalculated to account for that change. Reducing a homeowner's principal balance moves her closer to the finish line established by the termination date—in Fried's case, the date at which her outstanding principal balance would reach $431,597. According to the modified amortization schedule reflecting the reduced principal balance, the termination date, per 12 U.S.C. § 4902(d), would be recalculated to occur in 2014.

---

[3] A homeowner's mortgage insurance obligation will not end per § 4902(b)(1) on her termination date if she is not "current on the payments required by the terms of the residential mortgage transaction[,]" but that issue is not raised in this case.

11

But Chase went one step further. It replaced the original value of Fried's home with its BPO estimating the home's value at the time of the 2011 modification. The BPO's estimate was substantially less than her home's original value. So the substitution had the effect of moving Fried's finish line further away: she was not scheduled to pay down her debt to 78% of the BPO's $420,000 value (as noted, $327,600) until 2026.

According to Fried's complaint, her written agreement with Chase did not explicitly mention or change the original value of her home as defined by § 4901(12).[4] Compl. ¶ 51.

---

[4] Indeed, it is not obvious that even an explicit agreement could depart from § 4901(12)'s definition of "original value." The Protection Act sets a timeline for terminating mortgage insurance premiums on the basis of specific facts about the property and elements of the mortgage transaction: the purchase price or appraised value of the home and the loan's amortization schedule. 12 U.S.C. § 4901(18). Section 4902(d) updates that timeline with respect to terms and conditions of the loan, like the amortization schedule, that have been modified. But a home's purchase price and appraised value are not terms of the loan; they are facts that do not change with the loan's provisions.

Moreover, permitting lenders and servicers to modify at will the mortgage insurance termination date set by the Protection Act by redefining "original value" would arguably undermine the Act's purpose—to safeguard consumers from overpaying mortgage insurance premiums by setting a consistent and predictable termination date. If lenders and servicers could contract around the Act's timeline by redefining key terms, the Act would be no more than a

Chase does not contend otherwise, but instead responds that substitution of the BPO for the home's original value was permissible because it was a "term" or "condition" of Fried's modification under § 4902(d) that the HAMP rules required. Hence we turn to those rules.

The Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages (the "HAMP Handbook") states that "[s]ervicers must obtain an assessment of the current value of the property securing the mortgage loan being evaluated for HAMP." HAMP Handbook, 6.8 Property Valuation, Version 3.0, 73, available at https://www.hmpadmin.com/portal/programs/docs/hamp_serv icer/mhahandbook_30.pdf (December 2, 2010). It goes on to specify that "[s]ervicers may use either an automated valuation model (AVM), . . . a broker's price opinion (BPO), or an appraisal" to measure the property's value at the time of modification. *Id.* The Handbook, however, says nothing about using the BPO to calculate the period of a homeowner's mortgage insurance obligation. HAMP rules told Chase to get the BPO, but they did not require Chase to substitute that value for the "original value" that the statute, § 4901(18), relies on to compute the mortgage insurance termination date.

Chase responds that, even if not required by the HAMP, use of the BPO for the termination date calculation was a "condition" of the modification because Chase would not have modified the loan without first getting an updated property valuation. This argument suffers from the same logical flaw as Chase's argument tied more closely to the HAMP Handbook: even if Chase's obtaining a BPO was a prerequisite to Fried's mortgage modification, that cursory calculation does not replace under the Protection Act the

contractual default rule that a few lines of boilerplate could override. This issue, however, we need not decide.

original value of Fried's property for mortgage insurance purposes.

Should we interpret "conditions" expansively to include any necessary precursors to the modification of Fried's loan? We think not, as § 4902(d) relies on changes to the terms and conditions of the loan itself. No matter what led to the modification, the key inquiry is which of the *loan's* terms and conditions were modified, not any conditions precedent.

Most significantly, however, the Protection Act updates the termination date only with respect to the loan provisions that the parties "agree" to modify: "If a mortgagor and mortgagee . . . agree to a modification of the terms or conditions of a loan . . . [, the] termination date [for mortgage insurance payments] . . . shall be recalculated to reflect the modified terms and conditions of such loan." 12 U.S.C. § 4902(d). Here we come full circle to what did Fried and Chase actually agree.

The obvious objection is that if courts must look to each modification agreement to determine which terms and conditions the borrower agreed to modify in order to calculate the mortgage insurance obligation, the inquiry will be so individualized and factually intensive as to destabilize the mortgage market. But calculation of an updated termination date always requires reference to the modification agreement. There is no other way to know which terms and conditions of the loan have been modified. At the least, the updated principal balance and interest rate (whether fixed or variable) will depend on the agreement. Moreover, as Fried points out, inquiry into the terms of modification agreements likely will be a routine exercise, as servicers like Chase use an industry standard form for modifications. *See, e.g.*, *Rice v. Green Tree Servicing, LLC*, No. 3:14-CV-93, 2015 WL 5443708, at *5

14

(N.D.W. Va. Sept. 15, 2015) ("Under the Servicing Guidelines, servicers are directed to use Form 3157, a standard form, during the loan modification process . . . .").

Chase retorts that, regardless what its written agreement with Fried might say, its reliance on the BPO was justified because "all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where contrary intention is evident." *Williams v. Stone*, 109 F.3d 890, 896 (3d Cir. 1997) (quoting *Wright v. Commercial & Sav. Bank*, 464 A.2d 1080, 1083 (Md. 1983)). According to Chase, Fried impliedly agreed to substitute the BPO's estimate for her home's original value because the HAMP Handbook provided the background law for the modification agreement.

We disagree, for (as already discussed) nothing in the HAMP's requirements (even assuming they are "applicable or relevant laws") required substitution of the BPO for original value. And, in any event, § 4902(d) updates a homeowner's termination date to reflect the terms and conditions of her loan she agreed to modify and does not incorporate the provisions of a handbook that guides her servicer.

What is ironic is that Chase advocates a heads-I-win, tails-you-lose, interpretation of the HAMP. As the Seventh Circuit observed, when "homeowners [have] tried to assert rights arising under HAMP itself [against servicers,] [c]ourts have uniformly rejected these claims because HAMP does not create a private federal right of action for borrowers against servicers." *Wigod*, 673 F.3d at 559 n.4; *see also Senter v. JPMorgan Chase Bank, N.A.*, 810 F. Supp. 2d 1339, 1350–51 (S.D. Fla. 2011) ("Plaintiffs' reliance on the HAMP Guidelines[,] rather than a formula contained in their [agreements with Chase] to provide the terms of their permanent modifications[,] is an improper attempt to assert a

15

private right of action under the HAMP."); *Puzz v. Chase Home Fin., L.L.C.*, 763 F. Supp. 2d 1116, 1123 (D. Ariz. 2011) ("Even assuming that HAMP guidelines encourage lenders to provide [certain benefits] to their debtors, there is no authority for the proposition that HAMP or its regulations or guidelines create a private right of action against lenders who begin foreclosure without doing so."); *Coulibaly v. J.P. Morgan Chase Bank, N.A.*, No. CIV.A. DKC 10-3517, 2011 WL 3476994, at *15 (D. Md. Aug. 8, 2011) ("Plaintiffs may not establish liability by relying on Chase's alleged violations of certain servicing guidelines promulgated by the U.S. Department of the Treasury in connection with HAMP.").[5] The proverb "what is good for the goose is good for the gander" applies: the HAMP's provisions do not bind the parties to a mortgage modification only when they benefit Chase.

Moreover, courts have held—at least twice at Chase's behest—that the HAMP's rules are not themselves the terms of modification agreements between borrowers and servicers. *E.g.*, *Short v. Chase Home Fin. LLC*, No. CV-11-133-PHX-DGC, 2011 WL 9160941, at *3 (D. Ariz. Aug. 22, 2011) ("HAMP is not a contract between Plaintiffs and Chase, and did not amend Plaintiffs' loan documents."); *Wright v. Chase Home Fin. LLC*, No. CV-11-0095-PHX-FJM, 2011 WL 2173906, at *2 (D. Ariz. June 2, 2011) ("HAMP is not a contract between plaintiff and defendants, did not amend plaintiff's loan contracts, and does not contain a private right of action."); *see also Grona v. CitiMortgage, Inc.*, No. 3-12-0039, 2012 WL 1108117, at *5 (M.D. Tenn. Apr. 2, 2012)

---

[5] Where courts have allowed HAMP-related actions, the substantive "claims [were] based on contract, tort, and/or state consumer fraud statutes[,]" rather than the provisions of the HAMP itself. *Wigod*, 673 F.3d at 559 n.4.

("HAMP is not a contract between Plaintiff and Defendant. HAMP did not modify Plaintiff's Loan Documents, and HAMP does not contain a private right of action.").

For these reasons, the Protection Act's text does not support replacement of the $553,330 original value of Fried's home with Chase's $420,000 BPO.

## 2. *Statutory Structure and Legislative History*

Chase looks to the Protection Act's statutory structure and legislative history to counter the result we reach, but these guides to the Act's intent only strengthen our conclusion. Congress amended in 2000 the Protection Act with respect to loan modifications and refinancing transactions. *See* Private Mortgage Insurance Technical Corrections and Clarification Act (the "Corrections Act"), P.L. 106-569, 114 Stat. 2944 (2000) (amending 12 U.S.C. §§ 4901, 4902, 4903, 4905). The purpose of the Corrections Act was, among other things, to eliminate "uncertainty relating to the cancellation and termination of [mortgage insurance] for . . . loans whose terms or rates are modified over the life of the loan." 146 Cong. Rec. H. 3578-02, H3579 (May 23, 2000).

With respect to mortgage refinance transactions, which are distinct from mortgage modifications, Congress amended the definition of "original value" such that "[i]n the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, [original value] means only the appraised value relied upon by the mortgagee to approve the refinance transaction." 12 U.S.C. § 4901(12). Thus, when a homeowner refinances her home mortgage loan, the "original value" of her home will become the appraised value relied on

17

by the mortgagee.[6] And, accordingly, her termination date will reflect the new "original value." *See* 12 U.S.C. § 4901(18).

But for mortgage modifications Congress did not make any such provision to update a home's original value. Instead, with respect to modifications like Fried's, Congress added the language discussed above that "[i]f a mortgagor and mortgagee . . . agree to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the . . . termination date . . . shall be recalculated to reflect the modified terms and conditions of such loan." Corrections Act, PL 106–569, 114 Stat 2944 (2000); 12 U.S.C. § 4902(d). Unlike the refinance provision, the language Congress chose for mortgage modifications does not change the "original value" of a home when the modification occurs. Only the "terms and conditions" of the loan modified by the parties' agreement are updated, and, for the reasons detailed earlier, replacement of the original value with some other value is not necessarily one of them.

Chase contends that "Congress used different language and different statutory provisions with respect to loan modifications and refinanc[ings], but it provided that updated property valuations be used for [both modifications and refinancing transactions]." Chase's Reply at 14. Of course,

---

[6] Notably, even for a refinance transaction the "original value" is not necessarily the value of the home at the time of refinancing. Section 4901(12) incorporates the "appraised value *relied* upon by the mortgagee to approve the refinance transaction." *Id.* (emphasis added). If the mortgagee relied on the appraisal performed at the time of the home's initial sale, that appraised value would remain the "original value" of the home even after the refinancing.

18

when Congress uses different language in the same act, we usually presume the opposite—that different language points to a different result. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal brackets, quotation marks, and citation omitted)).

Here the distinction Congress drew makes sense. When a borrower refinances her mortgage, she pays off her old debt with a new loan, often from a different lender. A refinancing is a new "residential mortgage transaction." 12 U.S.C. § 4901(15) ("a transaction . . . in which a mortgage . . . or . . . security interest is created or retained . . . to finance the acquisition, initial construction, or refinancing of that dwelling"). The new lender thus should not be bound by the property valuation relied on by the initial lender.

A modification, on the other hand, is merely "an alteration or amendment" to the existing mortgage contract, *see Modification*, Black's Law Dictionary (10th ed. 2014), and is not a new "residential mortgage transaction," *see* 12 U.S.C. § 4901(15). While the Protection Act presumes that a lender will rely on an *appraisal* before completing a *refinancing* transaction, *see* 12 U.S.C. § 4901(18), the HAMP Handbook makes clear an appraisal is not a prerequisite to a *mortgage modification*. HAMP Handbook, at 73 ("Servicers may use either an automated valuation model (AVM), . . . a broker's price opinion (BPO), or an appraisal.").

Chase directs us to several passages of the Congressional Record to support its contention that § 4902(d)—despite its text—permits substitution of an updated property value at the time of modification for a

19

home's original value.[7] Not one of the passages it points to actually says that, nor do they overcome § 4902(d)'s text, structure, or amendment history.

Congress reasonably chose to treat mortgage modifications and refinancing transactions differently. Its explicit command to update the original value of a home when a mortgage is refinanced is strong evidence that it declined to permit such an update impliedly for mortgage modifications.

### 3. Fannie Mae Servicing Guidelines

Chase next argues that the Fannie Mae Servicing Guidelines support its position. Unlike the sources discussed above, they do permit what Chase did. However, we decline to follow the Servicing Guidelines because the Protection Act explicitly overrides them, and Fannie Mae's interpretation of the Protection Act is not entitled to deference.

Taken together, Fannie Mae and Freddie Mac "own or guarantee close to half of the home loans in the United

---

[7] For example, both in its brief and at oral argument Chase brought our attention to a statement of the Corrections Act's sponsor that the bill "clarifies that[,] in the case of . . . loan modifications, [loan-to-value] calculations are made based on the most recent amortization schedule, not based on an outdated schedule." 146 Cong. Rec. H. 3578-02, H3580 (May 23, 2000). But Fried does not dispute that an updated amortization schedule must be used to calculate her termination date. The amortization schedule was necessarily altered when her principal balance was decreased as agreed in the mortgage modification. Chase's mistake was its reliance as well on an updated value for her home.

States." *See Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 225 (2d Cir. 2012). Even for mortgages not owned or guaranteed by them, mortgage lenders and servicers "are guided in their decisions by Fannie Mae and Freddie Mac requirements." *Id.* (internal quotation marks omitted). As is typical in the secondary mortgage market, the pooling-and-servicing agreement between Chase and the owners of Fried's mortgage debt incorporates the Fannie Mae Servicing Guidelines.[8]

The Guidelines provide that servicers must calculate "[mortgage insurance] termination eligibility . . . [by] us[ing] the amortization schedule of the modified mortgage loan *and* the property value at the time of the mortgage loan modification." Fannie Mae Servicing Guide, B-8.1-04: Termination of Conventional Mortgage Insurance, https://www.fanniemae.com/content/guide/servicing/b/8.1/04.html (Jan. 18, 2017) (emphasis added). The Guidelines add that servicers must "adhere to applicable state law related to the type of valuation to use to determine the property value at

---

[8] Chase does not argue that the pooling-and-servicing agreement or the Fannie Mae Guidelines it incorporates are directly binding on Fried. *See e.g., Fellows v. CitiMortgage, Inc.*, 710 F. Supp. 2d 385, 405 (S.D.N.Y. 2010) (Servicing Guidelines are not incorporated into contracts between borrowers and lenders). It relies on the Fannie Mae Servicing Guidelines only as an interpretive guide to the Protection Act. *See* Oral Argument Jan. 18, 2017, at 34:14-22 ("[W]e're not contesting that the statute obviously ranks higher than . . . the Fannie Mae guide, but in trying to understand what 4902(d) means, we would look to Fannie Mae's consistent interpretation since 2010[.]").

the time of the mortgage loan modification[,]" but that generally "[a] BPO or a new appraisal may be used[.]" *Id.*

According to Chase, the Servicing Guidelines provide the definitive interpretation of the Protection Act's requirements. But Congress anticipated the possibility of conflicts between the Act and pooling-and-servicing agreements that rely on the Servicing Guidelines and explicitly provided that the Protection Act would take precedence:

> The provisions of this chapter shall supersede any conflicting provision contained in any agreement relating to the servicing of a residential mortgage loan entered into by the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any private investor or note holder (or any successors thereto).

12 U.S.C. § 4908(b). If the Servicing Guidelines would produce a result that departs from the Protection Act's text, there is a conflict, and per § 4908(b) the statute prevails.

Chase contends that we should defer to Fannie Mae's interpretation of the Protection Act under the doctrine of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which offers deference according to the "'thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Gonzales v. Oregon*, 546 U.S. 243, 268 (2006) (quoting *Skidmore*, 323 U.S. at 140). But Fannie Mae's Guidelines are not entitled to deference. First, they simply do not square with the text of the Protection Act.

Second, *Skidmore* deference is available only to agencies interpreting the statutes they administer. *See Mead Corp.*, 533 U.S. at 228. Fannie Mae and Freddie Mac are not administrative agencies. They "are federally-chartered but privately owned corporations that issue publicly traded securities." *Delaware Cty., Pa. v. Fed. Hous. Fin. Age*ncy, 747 F.3d 215, 219 (3d Cir. 2014).[9]

Nor does it administer the Protection Act. When Congress passed the Act it did not designate a regulator to interpret it. 146 Cong. Rec. H. 3578-02, H3581 (May 23, 2000) ("Unfortunately, when we passed the Homeowner's Protection Act, we were unable to prevail on one issue, and that was to actually have a regulator to work out some of the details of the statute and the underlying policy." (Rep. Vento)). Indeed, if deference to any entity would be appropriate under the Protection Act, we would owe it to the several financial regulatory agencies that Congress authorized to enforce the Act. *See* 12 U.S.C. § 4909(b).

Fourth, application of the Servicing Guidelines in this context would conflict with guidance issued by the Consumer Financial Protection Bureau ("CFPB"), one of the agencies

---

[9] When Fannie Mae and Freddie Mac were in desperate financial distress in 2008, "Congress created [an agency called the Federal Housing Finance Agency] to act as conservator for Fannie and Freddie." *Delaware Cty.*, 747 F.3d at 219 (internal quotation marks and citation omitted). "A conservatorship is like a receivership, except that a conservator, like a trustee in a reorganization under Chapter 11 of the Bankruptcy Code, tries to return the bankrupt party to solvency, rather than liquidating it." *Id.* (internal quotation marks and citation omitted).

23

authorized to enforce the Protection Act. A CFPB Compliance Bulletin provides as follows:

> Many mortgage loans are owned by Government-Sponsored Enterprises, or GSEs, such as Fannie Mae or Freddie Mac. These and other loan investors often create their own internal [mortgage insurance] cancellation guidelines that may include [mortgage insurance] cancellation provisions beyond those that the [Protection Act] provides.
>
> The CFPB cautions servicers to implement investor guidelines in a way that does not lead them to violate consumer financial law. Both the [Protection Act] and some investor requirements contain similar [loan-to-value] thresholds for [mortgage insurance] cancellation and termination, and use similar measures of the property's value. Servicers should nonetheless remember that investor guidelines cannot *restrict* the [mortgage insurance] cancellation and termination rights that the [Protection Act] provides to borrowers.

CFPB Bulletin 2015-03, Compliance Bulletin: Private Mortgage Insurance Cancellation and Termination, at 5, http://files.consumerfinance.gov/f/201508_cfpb_compliance-bulletin-private-mortgage-insurance-cancellation-and-termination.pdf (Aug. 4, 2015) (emphasis in original). Chase relied on the Servicing Guidelines to extend Fried's mortgage insurance obligation and thereby limited her termination rights, things (as the Bulletin advises) they cannot do.

24

Finally, as noted above, Fannie Mae and Freddie Mac own or guarantee nearly half the home mortgage loans in America. Mortgage insurance covers against loss to a loan's owner or guarantor from a borrower's default, and Fannie Mae is the *beneficiary* of mortgage insurance. *See* 12 U.S.C. § 1717(b)(2) (Fannie Mae charter provision requiring mortgage insurance when the outstanding principal balance of the mortgage at the time of purchase exceeds 80% of the value of the property securing the mortgage). Consequently, when it sets mortgage-insurance-related guidelines, Fannie Mae is not acting as an administrative agency neutrally interpreting laws for the marketplace; it is a market participant interpreting laws for the benefit of its shareholders and is not entitled to deference.

For these reasons, the Fannie Mae Servicing Guidelines are not persuasive and do not alter our conclusion that, taking the facts alleged in Fried's complaint as true, Chase violated the Protection Act.

### 4. Purpose and Consequences

Hoping to avoid the result dictated by the Protection Act's text, Chase contends that the statute's purpose and the consequences of the District Court's interpretation support reversal. We disagree.

Chase notes that the purpose of the Protection Act is to protect consumers from continuing to pay mortgage insurance premiums after they have accrued 20% equity in their homes, at which point mortgage insurance is no longer necessary. Our interpretation of the Protection Act is at odds with this purpose, Chase contends, because Fried (whose home's value dropped) may stop paying mortgage insurance premiums before she reaches 20% equity, while other consumers (whose

25

home values have risen) may continue paying after obtaining 20% equity.

When Congress enacted the Protection Act, however, it chose to prioritize predictability of consumers' mortgage insurance obligations over economic precision. The Act sets a homeowner's mortgage insurance termination date as the day her outstanding principal balance "is first scheduled to reach 78 percent of the original value of the property securing the loan[.]" 12 U.S.C. § 4901(18). Because housing values can fluctuate with national economic trends (as Fried's example demonstrates), the Protection Act's timeline does no more than approximate the economic need for mortgage insurance in any particular case. This sacrifice of precision for predictability allows the Act to provide both consumers and lenders with certainty as to their respective mortgage insurance obligations from the moment the original value is known and the amortization schedule is set.

Chase contends that, while Fried is harmed by the replacement of her home's original value with an updated value, most consumers would benefit from such a substitution. Its rationale is that, because most home values rise over time, we can safely assume that most borrowers seeking mortgage modifications will see the value of their homes increase between purchase and modification, and thus substitution of new for old home values will lead to shorter mortgage insurance obligations for most borrowers.

Based on recent history, the links in Chase's logical chain are weak. It is far from obvious that most homeowners seeking mortgage modifications would have seen their individual homes follow this upward trend. Indeed, if most homeowners receiving modifications bought during the recent housing bubble and modified after the burst, substitution of updated housing values for original values would

26

substantially increase their premium burdens if mortgage insurance termination dates change as Chase claims. It is exactly this narrative that Fried's case represents.

When it passed the Protection Act, Congress made a tradeoff between precision and predictability that we are not free to rebalance. Accordingly, we affirm the District Court's holding that Fried has adequately stated a claim that Chase violated the Act.

## B.      Statute of Limitations

This case is before us because the District Court certified interlocutory review of the controlling question of law discussed above. However, "once leave to appeal is granted the court of appeals is not restricted to a decision of the question of law which in the district judge's view was controlling." *Katz*, 496 F.2d at 754. Thus our Court may consider the other ground for dismissal Chase asserted in the District Court.

The Protection Act's statute of limitations provides that "[n]o action may be brought by a mortgagor . . . later than 2 years after the date of the discovery of the violation that is the subject of the action." 12 U.S.C. § 4907(b). Chase contends that Fried discovered its alleged violation of the Protection Act more than two years before she filed her complaint and that it therefore must be dismissed.

"Technically, the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense, like a statute of limitations defense, in the answer, not in a motion to dismiss." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). "In this circuit, however, we permit a limitations defense to be raised by a motion under Rule 12(b)(6) only if the time alleged in the statement of a claim shows that the

27

cause of action has not been brought within the statute of limitations." *Id.* (internal quotation marks and citation omitted). "Since the applicability of the statute of limitations usually involves questions of fact for the jury," *Van Buskirk v. Carey Can. Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir. 1985), "if the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)[,]" *Schmidt*, 770 F.3d at 249 (internal quotation marks, brackets, and citation omitted).

Chase argues that the statute of limitations began to run in August 2012 when Fried received its letter with the 2026 mortgage insurance termination date. But, after receiving that letter, Fried wrote back to ask how Chase arrived at the new date. It responded in October 2012 that "November 1, 2026 . . . is the date when the loan will reach 78% based on the modified terms and conditions." *Compl.* ¶ 53. Even then, the denominator of the fraction (78% of what?) remained a mystery. It was only in October 2013, following additional inquiries, that Chase specified that it used the BPO estimate of $420,000 obtained at the time of the mortgage modification to calculate Fried's termination date. Fried filed her complaint less than two years later in April 2015.

Whether Fried knew or should have known of "the violation that is the subject of [her] action[,]" 12 U.S.C. § 4907(b), when she received notice of the new termination date or notice of the basis of its calculation is a factual question. She asserts that she did not know, and could not have known, of the violation until she knew why Chase had said that her mortgage insurance obligation would automatically terminate in 2026. Indeed, the argument continues, until she knew the basis of Chase's move-back of the mortgage insurance finish line, she could not have known

28

whether it was Chase's conduct (or some other entity's) that may have violated the Act.

Moreover, when she received Chase's letters, Fried had not yet suffered the sort of injury that ordinarily would put one on notice of a legal violation. Her initial mortgage insurance obligation ran through March 1, 2016 (and her correctly modified termination date would have fallen in July 2014). Thus, when Fried received Chase's letters in 2012 and 2013, she was still paying mortgage insurance premiums as expected and had not yet been required to pay premiums she did not owe.

Fried's plausible contentions are enough to defeat Chase's motion to dismiss. Which of Chase's letters would have led Fried to discover her action is a factual question, and the answer to it is not clear from the face of the complaint. *See Schmidt*, 770 F.3d at 249. It is ripe for our remand.

*　　*　　*　　*　　*

The Protection Act sets the finish line (*i.e.*, the termination date) for each homeowner's mortgage insurance obligation on the basis of her home's original value and measures her progress toward it by looking to her outstanding principal balance. Fried's mortgage modification decreased her principal balance, but her home's original value under the Act did not change. The modification thus moved her toward the finish line per § 4902(d) of the Act, but, although her home had dropped in value, it did not move the line itself. Fried's termination date is the day her mortgage's outstanding principal balance was scheduled to reach $431,597. If she was current on her mortgage payments at that date, her mortgage insurance obligation ended then.

29

In this context, we affirm the District Court's determination declining to dismiss Fried's claim against Chase and remand for further proceedings consistent with this opinion.