NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2106
_____

PAMCAH-UA LOCAL 675 PENSION FUND; CLAYTON HOLLISTER,
Appellants
v.

BT GROUP PLC; IAN LIVINGSTON; GAVIN E. PATTERSON;
TONY CHANMUGAM; NICK ROSE; LUIS ALVAREZ; RICHARD CAMERON
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-17-cv-00497)
District Judge:  Honorable Kevin McNulty
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 5, 2021
_____

Before:  KRAUSE, PHIPPS, and FUENTES, *Circuit Judges*.

(Filed: August 5, 2021)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PHIPPS, *Circuit Judge*.

In this putative class action, two investors – a pension fund and an individual – sue BT Group along with several of its officers and directors for federal securities fraud. The investors allege that BT Group, a multinational telecommunications company formerly known as British Telecom, overstated profits for several years due to fraudulent accounting at one of its subsidiaries, BT Italy. They bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, *see* 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b-5, *see* 17 C.F.R. § 240.10b–5.

But securities fraud is not easy to allege: the Private Securities Litigation Reform Act imposes a heightened pleading standard for such claims. Under that statute, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also id.* § 78u-4(b)(1) (requiring the pleading to specify "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"). That required state of mind is scienter – the intent to deceive, manipulate, or defraud either knowingly or recklessly. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018); *Institutional Invs. Grp. v. Avaya, Inc.,* 564 F.3d 242, 252 (3d Cir. 2009). Thus, allegations must support an inference of scienter that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

In exercising subject-matter jurisdiction over this case, *see* 15 U.S.C. § 78aa; 28 U.S.C. § 1331, the District Court dismissed the investors' fourth amended complaint for failure to state a claim for relief because their allegations of scienter did not meet the heightened pleading standard. The investors filed a timely notice of appeal, invoking this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291.

On appeal, the investors defend the sufficiency of their scienter allegations on two grounds. First, they contend that the allegations as to the Chairman of BT Group's Audit Committee, Nick Rose, support a strong inference that he acted with scienter, and they seek to impute his mental state to BT Group. Second, the investors argue that their allegations regarding executives at BT Global Services and BT Italy, two other components of the BT Group corporate family, also support a strong inference of scienter. The investors then seek to impute the alleged mental states of those executives to BT Group by urging this Circuit to adopt the so-called 'corporate scienter doctrine.' *See, e.g.*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 474–76 (6th Cir. 2014). On *de novo* review, *see City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 166 (3d Cir. 2014), we reject the investors' arguments and will affirm the judgment of the District Court.

I.

The investors claim that BT Group overstated profits for several years, and when it eventually reported its profits accurately, its share price fell. BT Group's financial statements reported profits from BT Italy and included notations that BT Group was

3

examining the control environment at BT Italy.  In an October 2016 press release, BT Group identified prior overstatements of profits of approximately £145 million due to "certain historical accounting errors" stemming from inappropriate management behavior at BT Italy.  Fourth Am. Compl. ¶ 66 (JA265).  Later, through a January 2017 press release, BT Group announced that the overstatement of profits had exceeded £530 million.  After those revelations of accounting fraud, BT Group's publicly traded American Depositary Receipts (ADRs) lost more than 20% of their value (or approximately £8 billion in market capitalization).  But to state a claim for securities fraud, the investors' allegations must give rise to a strong inference that BT Group made those false financial statements with scienter.

II.

Several of the investors' allegations support an inference that Rose, the Chairman of BT Group's Audit Committee, made various assertions with scienter in BT Group's financial statements.  As far back as 2013, the Audit Committee had concerns about BT Italy.  And BT Group's SEC filings from 2013 and 2014 reported that the Audit Committee was monitoring internal controls and risk management at BT Italy.  The investors also allege that in November 2015, BT Italy employees told a BT Global Services executive about accounting irregularities.  They further allege that the Audit Committee knew in 2016 of a culture of bullying at BT Italy.  Even with that cumulative alleged knowledge, BT Group's financial statements reported improvements in the control environment at BT Italy in 2014, 2015, and 2016.

4

The problem for the investors is that their allegations also support the inference that BT Group intended to detect and prevent fraud. For example, at the Audit Committee's request, BT Group's Board of Directors visited BT Italy to review operations and meet with various personnel. BT Group also investigated the reports of workplace bullying at BT Italy. In addition, BT Group repeatedly disclosed concerns about BT Italy to the SEC, and it reported monitoring and investigating that situation and responding to internal complaints. Finally, BT Group voluntarily disclosed its prior inaccurate reporting, including the 2016 announcement of an approximately £145 million write-down for historical accounting errors at BT Italy, and the 2017 follow-up announcement that the write-down totaled £530 million. In sum, the investors offer several allegations supporting an inference that Rose acted with scienter, but those allegations are comparatively weaker than the contrary inference that he did not. *See Tellabs*, 551 U.S. at 314.

## III.

The investors' remaining allegations of scienter similarly fail. The allegations regarding executives at two other components of the BT Group corporate family – BT Global Services and BT Italy – do not give rise to a strong inference of scienter.

In attempting to allege scienter for executives at BT Global Services, one of BT Group's lines of business, the investors rely on foreign news articles. As amended, the complaint alleges that Italian prosecutors investigated and charged those executives, CEO Luis Alvarez and CFO Richard Cameron, for complicity in false accounting at BT Italy.

5

But the investors do not allege the crimes charged, the facts supporting the charges, or the extent (if any) to which the Italian charges implicate BT Group's securities filings in the United States at the time of the charged conduct. The investors also rely on other news articles quoting email correspondences. But they do not allege that Alvarez or Cameron sent, received, or even knew about those emails. Nor do those emails mention Alvarez at all. Instead, they concern Cameron's financial goals for the company. Through a third party, those emails report that Cameron wanted operating profit to increase by €700,000, that he suggested capitalizing labor costs as a solution, and that he would not accept an earnings estimate for an upcoming fiscal year below a certain amount. Additional articles quoting BT Italy executives include the executives' statements that they shared all economic and financial transactions with Alvarez and Cameron. Taken cumulatively, while also accounting for the vagueness of some allegations as well as the attenuation inherent in the second- and third-hand nature of some of the other allegations, the pleading is at most consistent with an intent to commit financial statement fraud. But that does not suffice under the ordinary pleading standard of plausibility, much less the heightened standard imposed by the Private Securities Litigation Reform Act. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (explaining "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with) [liability]"); *GSC Partners*, 368 F.3d at 239. Thus, even if the mental states for the BT Global Services executives could be imputed to BT Group (an issue not addressed today), these allegations would not support a claim for securities fraud.

The allegations regarding executives at BT Italy fall short, too. Those executives, CEO Giancarlo Cimini and CFO Luca Sebastiani, worked at BT Italy, a subsidiary of BT Group. But "parent companies are not, merely by dint of ownership, liable for the acts of their subsidiaries." *Fried v. JP Morgan Chase & Co.*, 850 F.3d 590, 595 n.2 (3d Cir. 2017). Even if our circuit embraced the corporate scienter doctrine, the investors would still need to plead that BT Group participated in BT Italy's alleged fraud – for example, through a cover-up. *See Rahman*, 736 F.3d at 246. Here, the investors make no such allegations.

* * *

Because the investors failed to plead that BT Group acted with scienter, they do not state a claim under Section 10(b). And that shortcoming forecloses their derivative claim under Section 20(a). *See Avaya*, 564 F.3d at 280. Accordingly, we will affirm the judgment of the District Court dismissing the fourth amended complaint.